1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF FLORIDA
2         MIAMI DIVISION
     CASE NO. 24-cr-20051-JEM
3

4    UNITED STATES OF AMERICA,       Miami, Florida

5              Plaintiff,       May 14, 2024

6         vs.                    11:46 a.m. - 4:36 p.m.

7    ALFRED LENORIS DAVIS,           Volume 1

8              Defendant.       Pages 1 to 163

9

              EXCERPT OF JURY TRIAL
10    BEFORE THE HONORABLE JOSE E. MARTINEZ
          UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES:

13   FOR THE GOVERNMENT:        JONATHAN BAILYN, ESQ.
                                UNITED STATES ATTORNEY'S OFFICE
14                              99 NE 4th Street
                                Miami, Florida 33132
15
                                KATIE L. SADLO, ESQ.
16                              UNITED STATES ATTORNEY'S OFFICE
                                500 South Australian Avenue
17                              Suite 400
                                West Palm Beach, Florida  33401
18
     FOR THE DEFENDANT:         ZELJKA BOZANIC, ESQ.
19                              BOZANIC LAW, P.A.
                                17100 Royal Palm Blvd.
20                              Suite 1
                                Weston, Florida 33326
21
                                HUMBERTO DOMINGUEZ, ESQ.
22                              LAW OFFICE OF HUMBERTO R. DOMINGUEZ
                                150 West Flagler Street
23                              Suite 2900
                                Miami, Florida 33130
24

25

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

2

1                  *STENOGRAPHICALLY REPORTED BY:*
            *MARY ANN CASALE, RDR, FPR-C, CLR, CSR-IL*
2                *Official Court Reporter*
             *United States District Court*
3             *Southern District of Florida*
            *400 North Miami Avenue*
4              *Miami, Florida 33128*
          *MaryAnn_Casale@flsd.uscourts.gov*
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                        I   N   D   E   X

2

3    <u>WITNESS</u>                                          <u>EXAMINATION</u>

4    JEFF M. JEAN-PIERRE
          Direct Examination by Mr. Bailyn          46
5         Cross-Examination by Ms. Bozanic          59
          Direct Examination (Resumed) by Mr. Bailyn  85
6         Cross-Examination by Ms. Bozanic          85
          Redirect Examination by Mr. Bailyn        98
7
     JASON BROWN
8         Direct Examination by Ms. Sadlo          103
          Cross-Examination by Mr. Dominguez       114
9         Redirect Examination by Ms. Sadlo        119

10   ADAM J. WEISENSTINE
          Direct Examination by Ms. Sadlo          122
11        Cross-Examination by Mr. Dominguez       140

12
                     GOVERNMENT'S EXHIBITS
13

14   <u>EXHIBIT</u>                                        <u>RECEIVED</u>
          1 through 8                                64
15        9 through 13                              121
          14                                         47
16        15                                        120

17

18

19

20

21

22

23

24

25

                STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

4

1           (Call to the Order of the Court.)

2           (Voir dire was reported and intentionally

3            excised after which the following proceedings

4            were held:)

5           THE COURT:  Iris, administer the oath to the

6    jurors, please.

7           COURTROOM DEPUTY:  Jurors, please stand and

8    raise your right hand.

9           (Jury panel duly sworn.)

10           THE COURT:  Members of the jury, now that you

11    have been sworn, I need to explain some basic principles

12    about a criminal trial and your duty as jurors.  These

13    are preliminary instructions.  At the end of the trial, I

14    will give you more detailed instructions.

15           By your verdict, you will decide the disputed

16    issues of fact.  I will decide all questions of law that

17    arise during the trial.  And before you retire to

18    deliberate together at the end of the trial, decide the

19    case, I will then instruct you again on the rules of law

20    that you must follow and apply in reaching your decision.

21           It will be your duty to decide what happened so

22    you can determine whether the defendant is guilty or not

23    guilty of the crimes charged in the indictment.  At the

24    end of the trial, I will explain the law that you must

25    follow to reach your verdict.  You must follow the law as

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1   I explain it to you, even if you do not agree with the

2   law.

3          You must decide the case solely on the evidence

4   presented here in the courtroom.  Evidence can come in

5   many forms.  It can be testimony about what someone saw

6   or heard or maybe even smelled.  It can be an exhibit

7   admitted into evidence.  It can be someone's opinion.

8   Some evidence proves a fact indirectly, such as a witness

9   who saw wet grass outside and people walking into the

10  courthouse carrying wet umbrellas.

11         Some indirect evidence, sometimes called

12  circumstantial evidence, is simply a chain of

13  circumstances that proves a fact.  As far as the law is

14  concerned, it makes no difference whether evidence is

15  direct or indirect.  You may choose to believe or

16  disbelieve either kind and should give every piece of

17  evidence whatever weight you think it deserves.

18         What's not evidence?  Certain things are not

19  evidence and must not be considered.  I will list them

20  for you now.

21         Statements and arguments of the lawyers.  In

22  their opening statements and closing arguments, the

23  lawyer will discuss the case, but their remarks are not

24  evidence.

25         Questions and objections of the lawyers.  The

1   lawyers' questions are not evidence.  Only the witnesses'
2   answers are evidence.  You should not think that
3   something is true just because a lawyer's question
4   suggests that it's true.  For instance, if a lawyer asks
5   the witness, You saw the defendant hit his sister, didn't
6   you, that question is not evidence whatsoever of what the
7   witness saw or what the defendant did, unless the witness
8   agrees with it.

9           There are Rules of Evidence that control what
10  can be received into evidence.  When a lawyer asks a
11  question or offers an exhibit, and the lawyer on the
12  other side thinks that it is not permitted by the Rules
13  of Evidence, that lawyer may object.  If I overrule that
14  objection, the question may be answered or the exhibit
15  may be received.  If I sustain the objection, then the
16  question cannot be answered or the exhibit cannot be
17  received.  Whenever I sustain an objection, you must
18  ignore the question and not try to guess what the answer
19  would have been.

20          Sometimes I may order that evidence be stricken
21  or that you disregard or ignore evidence.  That means
22  that when you are deciding the case, you must not
23  consider that evidence.  Some evidence is submitted only
24  for a limited purpose.  When I instruct you that an item
25  of evidence has been admitted for a limited purpose, you

1   must consider it only for that limited purpose and no

2   other.

3         Credibility of witnesses.  In reaching your

4   verdict, you may have to decide what testimony to believe

5   or disbelieve.  You may believe everything a witness

6   says, part of what a witness says, or none of what a

7   witness says.  In considering the testimony of any

8   witness, you may take into account the opportunity and

9   ability of the witness to see or hear or know the things

10  testified to, the witness's memory, the witness's manner

11  while testifying, the witness's interest in the outcome

12  of the case, and any bias or prejudice, whether other

13  evidence contradicted the witness's testimony, the

14  reasonableness of the witness's testimony in light of all

15  the evidence, and any other factors that bear on

16  believability.  I will give you additional instructions

17  for you to determine credibility of witnesses at the end

18  of the case.

19        As you know, this is a criminal case.  There

20  are three basic rules about a criminal case that you must

21  keep in mind.

22        First, the defendant is presumed innocent until

23  proven guilty.  The indictment against the defendant

24  brought by the Government is only an accusation, nothing

25  more.  It is not proof of guilt or anything else.  The

1    defendant, therefore, starts out with a clean slate.

2         Second, the burden of proof is on the

3    Government until the very end of the case.  The defendant

4    has no burden to prove innocence or to present any

5    evidence or to testify.  Since the defendant has the

6    right to remain silent and may choose whether to testify,

7    you cannot legally put any weight on a defendant's choice

8    not to testify.  It is not evidence.

9         Third, the Government must prove the

10   defendant's guilt beyond a reasonable doubt.  I'll give

11   you further instructions on this point later, but bear in

12   mind that the level of proof required is high.

13        Our law requires jurors to follow certain

14   instructions regarding their personal conduct in order to

15   help assure a just and fair trial.  I will now give you

16   some of those instructions.

17        Do not talk, either among yourselves or with

18   anyone else, about anything related to the case.  You may

19   tell people with whom you live and your employer that you

20   are a juror and give them information about when you will

21   be required to be in court, but you may not discuss with

22   them, or anyone else, anything related to the case.

23        Do not at any time during the trial request,

24   accept, agree to accept or discuss with any person any

25   type of payment or benefit in return for supplying any

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   information about the trial.  You must promptly tell me

2   about any incident you know of involving an attempt by

3   any person to improperly influence you or any member of

4   the jury.

5           Do not visit or view the premises or place

6   where the charged crime was allegedly committed or any

7   other premises or places involved or mentioned in the

8   case.  And you must not use internet maps or Google Earth

9   or any other program or device to search for or view any

10   location discussed in the testimony.

11           Do not read, watch, or listen to any accounts

12   or discussions related to the case which may be repeated

13   by newspapers -- excuse me, reported by newspapers,

14   television, radio, internet websites, or any other news

15   media.  Do not attempt to research any fact, issue or law

16   relating to this case, whether by discussion with others,

17   by library or internet research, or by any other means or

18   source.

19           In this age of instant electronic

20   communications and research, I want to emphasize that in

21   addition to not talking face-to-face with anyone about

22   this case, you must not communicate with anyone about the

23   case by any other means, including telephone, text

24   messages, email, internet chat, chat rooms, blogs, social

25   networking websites, and apps, such as Facebook,

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    Instagram, Snapchat, YouTube, Twitter, X, or anything
2    else that's been invented in the last 20 minutes.  You
3    may not use any similar technology or social media, even
4    if I have not specifically mentioned it.

5         You must not provide any information about the
6    case to anyone by any means, and that includes posting
7    information about the case, what you're doing in the case
8    on any device or Internet site, including blogs, chat
9    rooms, social websites, or any other means.

10        I know that people take pictures of what
11   they're having for lunch and post it on the Internet.  I
12   can't imagine who cares, but, you know, don't.  I don't
13   care what you eat, and I don't really think that anybody
14   cares what you're doing here now.  After it's over, you
15   can do whatever you want about it, but by no means should
16   you be discussing what's going on here.  The reason for
17   that is simple.  In order to discuss something, you have
18   to make up your mind about something.  You have to decide
19   what's real and what's not.  Don't.  It's just not worth
20   it.

21        You also must not use Google or otherwise
22   search for any information about the case or the law that
23   applies to the case, or the people involved in the case,
24   including the defendant, the witnesses, the lawyers, the
25   Judge.  It's important that you understand why these

1    rules exist and why they're so important.

2           Our law does not permit jurors to talk with

3    anyone else about the case or to permit anyone to talk

4    with them about the case because only you are authorized

5    to reach a verdict.  Only you have been found to be fair,

6    and only you have promised to be fair.  No one else is so

7    qualified.

8           Our law also does not permit jurors to talk

9    among themselves about the case until I tell you to begin

10   your deliberations because premature discussions can lead

11   to premature decisions.

12          Our law also does not permit you to visit a

13   place discussed in the testimony.  First, you can't be

14   sure that the place is in the same condition as it was on

15   the day in question.  Second, even if it is in the same

16   condition, once you go to a place discussed in the

17   testimony to evaluate the evidence in light of what you

18   see, you become a witness, not a juror.  As a witness,

19   you may now have a mistaken view of the scene that

20   neither party may have a chance to correct.  That's just

21   not fair.

22          Finally, our law requires that you not read or

23   listen to any news accounts of the case and you not

24   attempt to research any fact, issue, or law related to

25   the case.  Your decision must be based solely on the

1    testimony and other evidence presented in this courtroom.

2            Also, the law often uses words and phrases in

3    special ways so it's important that any definitions you

4    hear come only from the bench here, not from any other

5    source.  It wouldn't be fair to the parties for you to

6    base your decision on some reporter's view or opinion or

7    on some other information that you acquire outside the

8    courtroom.

9            These rules are designed to help guarantee a

10   fair trial and our law accordingly sets forth serious

11   consequences if the rules are not followed.  I trust that

12   you understand and appreciate the importance of following

13   these rules and to -- and in accord with your oath and

14   promise, I know you will do so.

15           Questions sometime arises as to whether

16   individual members of the jury will be permitted to take

17   notes during the trial.  The desire to take notes is

18   perfectly natural, especially for those of you who are

19   accustomed to taking notes because of your schooling or

20   the nature of your work.  It is requested, however, that

21   jurors not take notes during the trial.

22           One of the reasons for having a number of

23   jurors -- persons on the juror is to gain the advantage

24   of your several and individual memories concerning the

25   testimony presented before you.  And while some of you

1   might feel comfortable taking notes, other members of the

2   jury may not have skill or experience in note-taking and

3   may not wish to do so.  We don't want this to turn into a

4   note-taking contest where somebody says, Your memory is

5   wrong because, look, my notes are perfect, Look, it's

6   outlined, everything is there, and I wrote it down so

7   this must be right.

8         No.  Your memory is just as valuable as anybody

9   else's.  State your position.  Do not stick to it if you

10   don't think it's real, if you don't that think that it's

11   correct, but you have the right to express your opinion.

12         An indictment in a criminal case is merely the

13   accusatory paper which states the charge or charges to be

14   determined at the trial, but it is not evidence against

15   the defendant or anyone else.  Indeed, the defendant

16   entered a plea of not guilty and is presumed by the law

17   to be innocent.  The Government has the burden of proving

18   the defendant's guilt beyond a reasonable doubt.  And if

19   it fails to do so, you must find the defendant not

20   guilty.

21         Because the Government has the burden of proof,

22   it will go forward and present its testimony and evidence

23   first.  After the Government finishes or rests, what we

24   call its case in chief, the defendant may call witnesses

25   and present in evidence, if he wishes to do so.  You will

1    remember, however, that the law does not require the

2    defendant to prove innocence or produce any evidence at

3    all.  And no inference whatsoever may be drawn from the

4    defendant's election not to testify in the event that

5    they should so elect.

6            You'll notice that the court stenographer is

7    making a complete stenographic record of all that's said

8    during the trial, including the testimony of the

9    witnesses in case it should become necessary at a future

10   date to prepare printed transcripts of any portion of the

11   trial proceedings.  Such transcripts, however, if

12   prepared at all, will not be prepared in sufficient time

13   or appropriate form for your review during your

14   deliberations, and you should not expect to receive any

15   transcripts.  You'll be required to rely upon your

16   individual and collective memories concerning what the

17   testimony was.

18           I remember at one occasion, sometimes I can

19   look over and I can see the rough draft, and I can

20   remember what was said because it was just said.

21   Besides, I have been doing this a long time.  And

22   although my memory stinks, it doesn't about trial

23   testimony.  I have a pretty good memory about trial

24   testimony.  But I remember one time I looked over and it

25   showed that I had said something was gynecological.  I am

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1   pretty sure that I have never used that word, and I know

2   it wasn't right then.  The bottom line is, it's going --

3   they have a tape recording going on at the same time, but

4   what she's doing, she is not typing on a typewriter or a

5   computer.  She's typing into a word processor of some

6   sort that combines all these things into -- it's voodoo.

7   That's what it is.  I don't know how they do it, but they

8   do it, and they are really good at it, but it takes them

9   a while.  So don't expect to get transcripts.  You can

10  ask for them.  But the answer is going to be no, there's

11  no transcripts available, rely on your memory.

12          On the other hand, any papers and other

13  tangible exhibits received in evidence during the trial

14  will be available to you for study during your

15  deliberations.  On some occasions during the trial,

16  exhibits may be handed to you for a brief inspection

17  there in the jury box.  Others will not be shown to you,

18  but do not be concerned because, as I said, you will get

19  to see and inspect at the end of the case all the

20  exhibits that are received in evidence.

21          The indictment charges defendant Alfred Lenoris

22  Davis with one crime, the crime charged in the indictment

23  is called an a count.  Count I of the indictment charges

24  that the defendant did knowingly, and with intent to

25  defraud, use a counterfeit access device, that is a

1   counterfeit Florida driver's license, said conduct

2   affecting interstate and foreign commerce in violation of

3   Title 18, United States Code, Section 1029(a).

4           It is a federal crime to use counterfeit credit

5   cards or other access devices.  Defendant can be found

6   guilty of this crime only if the Government proves the

7   following facts beyond a reasonable doubt:

8           First, the defendant knowingly used a

9   counterfeit access device.  Second, the defendant knew

10  the access device was counterfeit and acted with the

11  intent to defraud or deceive.  And third, the defendant's

12  conduct affected interstate or foreign commerce.

13          An access device is a credit card, plate, code,

14  account number, electronic serial number, mobile

15  identification number, personal identification number, or

16  other means of account access that can be used, alone or

17  in conjunction with another access device to get money,

18  goods, services, or any other thing of value, or that can

19  be used to initiate a transfer of funds, other than a

20  transfer originated solely by a paper instrument.

21          A counterfeit access device is an access device

22  that's counterfeit, fictitious, altered or forged, or an

23  identifiable component of an access device or a

24  counterfeit access device.

25          To use includes any effort to obtain money,

1  goods, services, or any other thing of value, or to

2  initiate a transfer of funds with a counterfeit access

3  device.

4           To act with intent to defraud means to act with

5  intent to deceive or cheat, usually for personal

6  financial gain, or to cause financial loss to someone

7  else.

8           The heart of the crime is the knowing use of a

9  counterfeit access device with intent to defraud.  The

10  Government does not have to prove that anyone was

11  actually deceived or defrauded.

12           The term interstate commerce refers to any

13  transaction or event that involves travel, trade,

14  transportation, or communication beyond a place in one

15  state and a place in another state.

16           The term foreign commerce relates to any

17  transaction or event that involves travel, trade,

18  transportation, or communication between a place in the

19  United States and a place outside the United States.

20           The Government does not have to prove that the

21  defendant specifically intended to interfere with or

22  affect interstate or foreign commerce, but the Government

23  must prove that the natural consequence of the acts

24  alleged in the indictment would be to affect interstate

25  or foreign commerce.  For example, if you find beyond a

1    reasonable doubt that the device was used to purchase

2    goods from another state or the device was used to

3    purchase goods manufactured outside the State of Florida,

4    you may find that interstate foreign commerce has been

5    affected.

6            The trial will now begin.  First, the

7    Government will make an opening statement.  And we'll do

8    that after lunch so you'll have an opportunity to have a

9    full tummy before we get started, which is simply an

10   outline to help you understand the evidence as it comes

11   in.

12           Next, the defendant's attorney may, but do not

13   have to, make opening statements.  Opening statements are

14   neither evidence nor argument.

15           The Government will then present its witnesses,

16   and counsel for defendant may cross-examine them.

17   Following the Government's case, the defendant may, if he

18   wishes, present witnesses whom the Government may

19   cross-examine.

20           After all the evidence is in, the attorneys

21   will present their closing arguments, summarize and

22   interpret the evidence for you, and I will instruct you

23   on the law.  After that, you'll go to the jury room to

24   decide your verdict.

25           Now, we're going to break now for lunch, but I

1   want to remind you that you're not to discuss the case

2   with anyone or permit anyone to discuss it with you.

3   Until you retire to the jury room at the end of the case

4   to deliberate on your verdict, you're simply not to talk

5   about this case.  Even though this case is only going to

6   be a day and a half or two days long, you're going to get

7   sick of hearing this because I am going to read it to you

8   every time I get a chance, although I may skip parts of

9   it.

10          Also, remember, you are not to read or listen

11   to anything touching on this case in any way.  If anyone

12   should try to talk to you about the case, bring it to my

13   attention promptly.

14          Keep in mind you must not do any research or

15   make any investigation about the case on your own.  The

16   only evidence in this case is the testimony of the

17   witnesses that you hear in court and the evidence that is

18   introduced during the official proceedings in the

19   courtroom.

20          Also, remember you must not have any contact

21   with the attorneys, parties or witnesses in the case.  If

22   you should see them, keep in mind that they are not being

23   rude to you, they are required to avoid any contact with

24   you, and they are not permitted to talk to you, just as

25   you are not permitted to talk to them.

1          Finally, remember you must not form any opinion

2     about this case until all the evidence is in.  You are

3     required to keep an open mind until you start your

4     deliberations at the end of the case.

5          Now I'm going to excuse you for lunch.  We're

6     going to recess until 1:30.  Now, let me tell you, there

7     is a cafeteria on the 7th floor.  If there is a tornado

8     outside, I would recommend you go to the 7th floor to

9     eat.  Otherwise, there's lots of places around here to

10    eat.  There is Chick-Fil-A right across the street at the

11    Brightline station.  There's one of those food trailers

12    or food trucks right outside the Brightline.  Miami-Dade

13    College is one block in that direction.  Where there's

14    kids, there's food.  There is a McDonald's.  There's all

15    sorts of places around there.

16         If you walk down to Flagler Street, you'll find

17    Peruvian restaurants, Mexican restaurants, all sorts of

18    places that are reasonably decent to eat.  Do not

19    hesitate to go to any of those places and try them out.

20    You might find something interesting.

21         But be back here at 1:30.

22         Now, I will let you go into the jury room and I

23    will have Iris go with you and she will tell you how to

24    come back in, but you come back in through this hallway

25    and if you get here early and you want to just hang out,

1  hang out here.  Do not use the bathrooms on the floor.

2  You're not supposed to be interacting with other people,

3  including the parties and the lawyers or witnesses or

4  friends or family.  So please, there's only two bathrooms

5  on this floor.  It's better if you use the bathrooms in

6  the jury room.  There's two bathrooms in the jury room.

7  There's water in the jury room.  Try to stay away from

8  the lobby.  There's only one set of elevators in this

9  building.  Use them to come up here and then get off.

10  If you get on the elevator, and you see one of

11  the parties' lawyers, they'll probably get off the

12  elevator.  They're supposed to so that they're not mixing

13  with you.  They're not being rude to you.  You haven't

14  forgotten your deodorant or anything.  It's just they're

15  trying to avoid the appearance of impropriety, which

16  sometimes is just as important as the actual fact of

17  impropriety.

18  When you're sitting in the jury room, I know --

19  jury box, I know that some of you indicated that you

20  might have physical problems that you might need to stand

21  up once in a while.  That's fine.  Sit on one of the end

22  chairs.  There's no seating chart.  I mean, I put you in

23  there because I called you in the order that you were

24  being called in, but you don't have to sit in that order.

25  I don't want you doing a roller-derby to bump

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   people out of the way to get to a good, preferable chair

2   but we try to be as safe as we can.  You will notice we

3   have those shields so that you're not exposed to any

4   witnesses that come in here.  This is not a case where

5   there's a bunch of people coming in and walking around,

6   but I like to keep -- It doesn't seem to bother anybody

7   and I'd rather have -- I'd rather be safe than sorry.  So

8   we try to be as helpful as we can in keeping people from

9   breathing on you, but you are all on your own.  If you

10  want to wear a mask, you're welcome to wear a mask, but I

11  don't know that it's actually necessary at this point.

12          In any event, I'll excuse you now to go into

13  the jury room.  Be back here at 1:30, which is an hour

14  and 20 minutes.  It should be plenty of time.

15          COURT SECURITY OFFICER:  All rise.

16          (Jury exits at 12:09 p.m.)

17          THE COURT:  You may be seated.

18          When we're finished talking, I would appreciate

19  it if you'd leave the floor as soon as possible so that

20  when the jury comes out, the lobby is clear.

21          When we come back, we'll start -- how long do

22  you need for openings?

23          MR. BAILYN:  Less than ten minutes from the

24  Government, your Honor.

25          THE COURT:  Defense, what is your position?

1          MS. BOZANIC:  Same.  I don't think it's going

2    to take --

3          THE COURT:  All right.  So I'll give you 15

4    minutes each so we don't have -- we'll cut it down then.

5          You asked earlier about motions.  Are you

6    talking about the motions in limine?

7          MS. BOZANIC:  Judge, the United States is

8    attempting to introduce some 404(b) materials and a prior

9    conviction -- well, they are arguing -- one of the

10   arguments they are making is that the reason why my

11   client might have used a fraudulent driver's license is

12   because he is a convicted felon, and that's their theory.

13        I would ask that the Court does not allow for

14   them to introduce prior convictions.  They actually

15   provided two.  My client's report at some point was ran.

16   Other people's credit reports were ran.  There was a

17   credit report.  There was a background check.  The

18   inquiry could have resulted in a bad credit report.  It

19   could have resulted in a bad -- somebody who had an

20   eviction or a criminal history.

21        So for the Government to say, hey, we believe

22   that he used a fraudulent driver's license because he is

23   a convicted felon is just a theory.  There is absolutely

24   no evidence of that, and I would ask that the jury be

25   instructed that there would be a negative inference if

| | |
|---|---|
| 1 | his report was ran, whether that's a credit report or |
| 2 | background check, that there would be a negative |
| 3 | inference, as opposed to mentioning that he is a |
| 4 | convicted felon.  And I would also object to any |
| 5 | convictions, criminal convictions being introduced for |
| 6 | the purpose of establishing this Government's theory that |
| 7 | that is the reason why. |
| 8 | THE COURT:  Well, what I was going to say is, |
| 9 | before you introduce any evidence of prior convictions, |
| 10 | tell me that you're going to do it and then tell me why |
| 11 | you're going to do it and what your authority is for |
| 12 | doing it, and I'll rule at that point. |
| 13 | I think that in a vacuum it's not easy to make |
| 14 | a determination on that, and I would assume that the |
| 15 | Government is acting in good faith and will tell us |
| 16 | before they mention it in the presence of the jury as to |
| 17 | why they would be doing that. |
| 18 | MR. BAILYN:  Yes, Your Honor.  This may be |
| 19 | helpful just for opening statement because we have |
| 20 | noticed 404(b) evidence of the defendant's prior |
| 21 | conviction, as well as his prior tenancy at this exact |
| 22 | same condominium unit.  The Government offered the |
| 23 | defense to stipulate merely to the fact that the |
| 24 | defendant is a convicted felon.  The defense refused to |
| 25 | stipulate. |

1          We do have a theory of the case that the

2    defendant lied about who he was because he was a

3    convicted felon.  The idea that he was trying to hide his

4    eviction report or credit report is entirely contradicted

5    by the evidence because the condominium association

6    didn't run an eviction report, didn't run a credit

7    report.  It solely ran a criminal background check for

8    the date charged in the indictment, April 13, 2023.

9          So we are happy to -- and I know that the Court

10   mentioned this to my colleague during calendar call --

11   introduce the fact of his felony conviction through many

12   different ways that can vitiate any of the prejudice that

13   the defendant is concerned about.

14         I don't intend to introduce the judgments of

15   conviction, although I do have the certified copies, both

16   of the defendant's state and federal conviction with me.

17   We would merely ask that the special agent be allowed to

18   simply say he ran the defendant's background, and, yes,

19   he does have a criminal history.  That's it.  We're not

20   trying to get into the facts of conviction, when he was

21   convicted, whether it was state, whether it was federal,,

22   but the fact that the defendant is a convicted felon is

23   inextricably intertwined with this case.  It is a motive

24   for him to lie about who he was.

25              THE COURT:  Okay.  We'll talk about it before

1    the opening statement.  You can be back at 1:15, and

2    we'll give you five minutes each to argue it, although

3    you seemed to have argued it already.

4           MS. BOZANIC:  There is another issue that the

5    Government wanted to introduce some 404(b) evidence

6    regarding a lease in 2018.  In that background check,

7    there was an eviction check, a credit report check, and a

8    background check.  It was done with a different driver's

9    license, also in the name of Rod Lesperance.  So that

10   would be another argument we would need to make in front

11   of your Honor.

12          THE COURT:  What is that taking about?

13          MR. BAILYN:  Your Honor, so we filed a notice

14   of intent to introduce evidence.  Let me just briefly

15   explain the defendant's crime and why this evidence is

16   relevant.

17          The defendant used a fraudulent -- a

18   counterfeit driver's license to become an occupant at

19   Unit 2004 at 400 Sunny Isles.  This was in 2023.

20          THE COURT:  Okay.

21          MR. BAILYN:  In 2018, the defendant did the

22   exact same thing at the exact same apartment building

23   with a driver's license with the exact same name and

24   exact same driver's license number.  The defendant

25   committed an identical fraud against the same victim just

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    a few years before.

2             And the reason that the defendant in 2023, as

3    he's been charged, had to use the name Rod Lesperance was

4    because he used the name Rod Lesperance against that

5    exact same condominium building just a few years before.

6    This was all part of a years-long scheme for him to

7    live --

8             THE COURT:  What's the prejudice in that?

9             MS. BOZANIC:  Judge, the prejudice is that the

10   Government doesn't have any evidence that my client is

11   the one who committed the crime in 2023, in April.  And

12   so they're trying to introduce --

13            THE COURT:  Doesn't that go to the weight of

14   it?  Isn't that what you're going to be arguing?  You can

15   argue that to the jury, but it's --

16            MS. BOZANIC:  It's extremely prejudicial,

17   Judge.  It's very remote in time.  It happened in 2018,

18   and it's character evidence that's not admissible.  It

19   goes to show the propensity that he is, more likely than

20   not, to commit the second crime or the crime that he is

21   charged with in 2023.

22            THE COURT:  You're saying it might not even be

23   him.

24            MS. BOZANIC:  Well, Judge, it is a driver's

25   license with a photo that looks like him.

1      THE COURT:  Well, that's precisely why it's

2  admissible.

3      MS. BOZANIC:  And I think that they have --

4  they also have a property manager, who -- I believe he is

5  on the witness list.  He is supposed to testify that he

6  knew that Mr. Davis -- he knew my client as Rod

7  Lesperance.

8      Judge, the first 404(b) notice that was filed

9  on April 23rd did not mention anything about these

10  documents.  My investigator actually went to speak to

11  Jeff Jean-Pierre, who is the property manager on May 1st.

12  That witness told my investigator that no other documents

13  existed regarding the 2018 lease.

14      Hours after that conversation, I got a notice

15  that the Government was sending additional materials.

16  And on May 2nd, I was able to download a lease from 2018.

17  That lease was never provided before the original 404(b)

18  notice, it wasn't in the 404(b) notice, and when the

19  Government argued or made out their argument in the

20  404(b) notice, somewhere in the conclusion they

21  specifically say that they are trying to deduce that my

22  client was known as Rod Lesperance through both

23  testimony, which I imagine was Jean-Pierre, and the

24  defendant's counterfeit driver's license.  There was no

25  mention of this whole new lease and the background check

1    from 2018.  On May 8th, they filed a notice of --

2    attempting to introduce those documents.  I was a little

3    shocked because I did not know they were trying to

4    introduce the 2018 paperwork.

5         So for those reasons, I think that, first of

6    all, it's prejudicial.  Second --

7         THE COURT:  If it weren't prejudicial, it

8    wouldn't be relevant.  The question is, is it unfairly

9    prejudicial.

10        MS. BOZANIC:  It is, Judge.

11        THE COURT:  Well, I mean, don't argue it is

12   prejudicial because if it wasn't prejudicial, it wouldn't

13   be relevant; would it?

14        MS. BOZANIC:  Judge, it's overly prejudicial

15   because the Government is using cases where there -- you

16   know, there are cases where something --

17        THE COURT:  You're dancing around my comment.

18   I guess you don't have an answer to that.

19        Go ahead.

20        MS. BOZANIC:  It is highly prejudicial, Judge,

21   because my client is charged with a crime, one single

22   count, that happened in 2023.  Now, they're trying to say

23   he did this again in 2018, and now they are --

24        THE COURT:  404(b) does permit other crimes to

25   be entered, if it shows motive, method of operation, all

1    sorts of things; doesn't it?

2          MS. BOZANIC:  That is true, Judge, but it does

3    not show the motive or the method of operation.  The

4    first lease in 2018 was submitted -- he was added as a

5    resident for a lease under the name of Booker Warren.

6    The second one in 2023 --

7          THE COURT:  So you don't think that submitting

8    a driver's license with the same picture and the same

9    name as he did, supposedly or allegedly at a later time,

10   shows that method of operation?  I think an argument can

11   be made very logically that it does.

12         MS. BOZANIC:  Judge, the first thing they have

13   to do is prove that it was him who did it.  And in

14   2018 --

15         THE COURT:  Doesn't the picture give them the

16   opportunity to prove that?

17         MS. BOZANIC:  Circumstantially, yes, your

18   Honor.

19         THE COURT:  I don't think it's circumstantial

20   at all.  I mean, I think most of the time prosecutors

21   would kill -- and I am being facetious -- to get a

22   picture of a prior person, and they have a picture.

23         So, no, I'll overruled your objection.  I'll

24   permit it.

25         MS. BOZANIC:  Judge, you are permitting --

1    THE COURT:  I'll permit both of them.

2    MS. BOZANIC:  Which one?

3    THE COURT:  Both, both, the thing that you just

4  argued about and the thing you argued about ten minutes

5  ago.

6    MS. BOZANIC:  I'm sorry.

7    THE COURT:  I was going to say that we argue

8  about it at 1:15, but we've already argued about it.  So

9  I have already decided.  I will permit it over objection.

10    MS. BOZANIC:  In that case, if you are allowing

11  the certified convictions, there is case law that allows

12  for the Government to just mention what the Government

13  just said, to just mention that his background check

14  would have had a criminal history, not to introduce the

15  actual convictions.

16    THE COURT:  They offered you that as an option,

17  and you rejected it.  So at this point, I will permit

18  them to do whichever way they wanted.

19    MS. BOZANIC:  Judge, the rulings in the

20  previous cases were -- I am talking about case law.  If

21  your Honor rules a certain way and says that certified

22  convictions or the previous criminal history is

23  admissible, then usually the judge -- or in previous

24  cases, the judge would say, I will allow them just to

25  talk about the fact that he has a criminal history.  So I

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1      would ask your Honor --

2                  THE COURT:  They can do that if they want to,

3      but I think they can also introduce -- you know, prove it

4      in whatever way they want to prove it.  I'll permit it.

5                  MS. BOZANIC:  Judge, it's very prejudicial.

6      There are two convictions.  There is a 2004 and there is

7      a 2010.  There is no reason why the Government should

8      walk around and introduce two different criminal

9      convictions.

10                 THE COURT:  Anything that is probative is

11     prejudicial.

12                 Do you understand --

13                 MS. BOZANIC:  Yes, your Honor.

14                 THE COURT:  -- the difference?

15                 It has to be unfairly prejudicial or in

16     violation of the Rules, and I do not think that it is.  I

17     will permit it.

18                 We'll be in recess.  We don't have to be back

19     at 1:15 because you've already done your argument.

20                 MR. BAILYN:  So we'll begin at 1:30?

21                 THE COURT:  1:30.

22                 MR. BAILYN:  Thank you, your Honor.

23                 (Court recessed at 12:21 p.m. to 1:34 p.m.)

24                 (Jury enters at 1:34 p.m.)

25                 THE COURT:  You may be seated.  I'm going to

1    count you every time because one time somebody followed

2    the jury into the jury room -- I have no idea why -- and

3    we had an extra person sitting there for about 30

4    seconds.  I did figure it out eventually.

5            As I told you, first, the Government will make

6    an opening statement, which is simply an outline to help

7    you understand the evidence as it comes in.  Then the

8    defense may -- but they don't have to -- make opening

9    statements.  They have asked for and I have given them

10   each 15 minutes.  The statements that the lawyers make

11   now as well as the arguments that they present to you at

12   the end of the trial are not to be considered by you

13   either as evidence in the case, which comes only from the

14   witnesses and the exhibits, or as your instruction on the

15   law, which comes from here.

16           These statements or arguments are,

17   nevertheless, intended to help you understand the

18   evidence as it comes in, the issues or disputes you will

19   be called upon to decide, as well as the positions taken

20   by both sides.

21           So I ask that you now given the lawyers your

22   close attention as I recognize them in turn for the

23   purpose of making an opening statement.

24           The light -- there is a green light that will

25   be showing up somewhere, yeah, right over there and over

1    here.  I ask that the lawyers remain at the lectern.  I

2    don't like lawyers schmoozing around and leaning over the

3    railing.  You may turn the lectern to face the jury.

4         When there's, let me see, two minutes to go,

5    the green light will start flashing.  When there's one

6    minute to go, the yellow light comes on.  When the red

7    light comes on, you turn into pumpkins and you must go

8    home.

9         You may proceed, sir.

10        MR. BAILYN:  Thank you, your Honor.

11        Ladies and Gentlemen of the Jury, the

12   defendant, Alfred Davis, lied about the most basic aspect

13   of his life.  He lied about who he was.  And he did it so

14   he could pass a background check and gain access to a

15   luxury condominium building overlooking the bay.  He

16   gained access to a building he had no right to be in.  He

17   gained access to an apartment he had no right to live in.

18   And he didn't just do this once.  He did it twice, the

19   exact same apartment building, once in 2018, once in

20   2023.

21        MS. BOZANIC:  Objection.

22        THE COURT:  Overruled.

23        MR. BAILYN:  The defendant defrauded this

24   building because, this evidence will show, there was

25   something he wanted to hide.  This defendant is a

1    convicted felon, state conviction, federal conviction.

2         MS. BOZANIC:  Objection.

3         THE COURT:  Overruled.

4         MR. BAILYN:  And he had to use a different

5    identity to pass a background check.  So he pretended he

6    was Rod Lesperance.  He used a counterfeit driver's

7    license with a picture of himself, but with someone

8    else's date of birth, someone else's driver's license

9    number, and someone else's name.

10        Now, you'll learn that condo buildings are not

11   Fort Knox.  They don't always have the tools necessary to

12   protect themselves from being defrauded, and it wasn't

13   until the Federal Government started looking for this

14   defendant that his fraud was uncovered.

15        MR. DOMINGUEZ:  Objection.

16        THE COURT:  There is no tag-teaming.  If she's

17   handling it, she's handling it.

18        MR. DOMINGUEZ:  That's fine, Judge.

19        THE COURT:  If you're handing it, you're

20   handling it.

21        MS. BOZANIC:  Judge, objection.

22        Can we come sidebar?

23        THE COURT:  No.  Objection is overruled.

24        MR. BAILYN:  As the Judge explained, this

25   defendant is charged with one crime, access device fraud.

1    Now, there are three elements to that crime.  An element

2    is something that we have to prove for you to find this

3    defendant guilty.

4          The first element is that the defendant used a

5    counterfeit access device.  In this case, the evidence of

6    that will be a fake or counterfeit driver's license, a

7    driver's license with this defendant's photograph.

8          Second, the defendant had to intend to defraud

9    or deceive.  In this case, the defendant lied about who

10   he was.

11         Third, the defendant's conduct had to affect

12   interstate commerce.  In this case, the defendant

13   defrauded a national background check.

14         So let me briefly describe for you the facts

15   that you will learn during this trial.  In 2018, the

16   defendant decided that he wanted to live at 400 Sunny

17   Isles.  It is a beautiful condominium building, and

18   someone he knew had a lease there.  The defendant added

19   himself as an occupant.

20         You'll learn during this trial that there's an

21   approval process before somebody can be added as an

22   occupant or as a resident.  That approval process has a

23   few steps.  The first one is that when someone signs a

24   lease.  Next what happens?  Well, someone has to go

25   through the approval process and be approved by the

1     condominium association.  How does the condominium

2     association do that?

3            First, they ask who you are and to verify who

4     you are, they ask for a driver's license or they ask for

5     a passport.  They then take the information that you've

6     provided them, and they do a background check.  These

7     background checks can check for a few things; eviction

8     history, your credit report, or your criminal background.

9     After running the background check, the condominium

10    association will make a decision as to whether or not to

11    approve you as a resident.

12           Now, the condominium association has the

13    discretion to approve or deny, but you'll learn during

14    this trial that this background check process is a very

15    important part of that decisionmaking process.  That's

16    how it's supposed to work.  But what did the defendant do?

17           Well, when he was asked to prove who he was, he

18    provided a counterfeit driver's license, a driver's

19    license that said his name was Rod Lesperance.  It gave

20    another date of birth, and it had a different driver's

21    license number.  So when the condominium association ran

22    a background check, a background check that they should

23    have been running on Alfred Davis, they did not find that

24    he was a felon.  He came back clean.  That was for Unit

25    903 in 2018.

1          This defendant did it again.  In 2023, he
2    decided he wanted an upgrade.  He wanted to live in
3    Unit 2004.  His mother is the person on the lease of
4    Unit 2004.  You'll hear during this trial there's no
5    evidence of her ever living there.  This defendant wanted
6    to add himself as an occupant, so he was asked by the
7    property management, just like he was asked before, You
8    need to provide your driver's license or identification
9    so that we can go through the approval and background
10   check process.  And just like before, the defendant used
11   a counterfeit driver's license.  It had a picture of the
12   defendant, the name of Rod Lesperance, different date of
13   birth, different driver's license number.  And just like
14   before, the defendant's background check came up clean,
15   and he was approved.

16          Those are the facts of this case.  So how will
17   we prove it to you?  First, you'll hear from someone from
18   the property management at 400 Sunny Isles.  I mentioned
19   him before.  His last name is Jean-Pierre.  He's worked
20   himself up to be an assistant property manager, and he'll
21   explain to you how this background check approval process
22   works.  He'll tell you why the condominium asks for
23   information.  He'll tell you how the condominium
24   association keeps records, and he'll show you photocopies
25   of the two counterfeit driver's licenses that this

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1     defendant submitted, both with his picture on them.

2          Next you'll hear from Jason Brown.  Jason Brown

3     runs backgrounds and background checks.  That's the

4     background check company that performed the background

5     checks in this case.  And his testimony will be important

6     because he'll explain to you that interstate commerce

7     element I mentioned earlier.  He'll explain to you that

8     these national background checks pull data from more than

9     just the State of Florida.  They pull it from counties

10    and districts and states all over the country.  That's

11    what makes this a federal crime.

12         And third, you'll hear from Special Agent

13    Weisenstine.  He was able to gather records from the

14    Florida Department of Motor Vehicles.  He'll show you the

15    defendant's actual driver's license records, and he'll

16    show you the records that come back from the counterfeit

17    driver's license that the defendant used.

18         By the end of this trial, you will have

19    everything you need to find those three elements that I

20    just discussed.  But let me make this clear, this case

21    isn't about failure to pay rent.  This case isn't about

22    being a good or bad tenant.  This case is about a lie, a

23    lie about who the defendant was.  Because of that lie, he

24    gained access to something that he was not entitled to.

25    That is access device fraud.

1                    THE COURT:  Defense?

2                    MS. BOZANIC:  Thank you, your Honor.

3                    This case is about pieces of a puzzle.  Ladies

4     and Gentlemen of the Jury, again, my name is Zeljka

5     Bozanic, and along with Humberto Dominguez, my

6     co-counsel, it is my honor to represent Alfred Davis

7     today.

8                    The reason why we're here today is because

9     Mr. Davis has pled not guilty, and in this country when

10    you plead not guilty, you're presumed innocent.  The

11    Government has the burden to prove the case beyond a

12    reasonable doubt.  They're the ones who are supposed to

13    put these pieces of a puzzle for you and convince you

14    that somebody is guilty beyond a reasonable doubt.  Not

15    only do they have to prove beyond a reasonable doubt

16    somebody committed a crime, they have to prove every

17    single element, they have to prove each and every single

18    element beyond a reasonable doubt.

19                    Now, everybody has a constitutional right to go

20    to trial and be judged by a jury, be judged by a jury,

21    not just the judge, not just the Government, not just the

22    attorneys.  The reason why we have this constitutional

23    right to be judged by the jury is because you're those

24    jurors who are reasonable people that we thought would be

25    the right persons to sit on this jury.  You are the

1    people who are supposed to use your commonsense.  You

2    don't need to know what the law is because you'll be

3    instructed on what the law is.  You don't need to concern

4    yourself with, you know, whether you know what the law

5    says about a certain element.  All of these instructions

6    are going to be given to you.

7         All I'm asking you to do is have an open mind

8    and listen to the evidence.  What the Government just

9    said is not evidence at all.  This is their theory.  They

10   believe they got it right.  I'm asking you to keep your

11   mind open, to look at the evidence, to listen to the

12   evidence, where does the evidence come from?  It comes

13   from the witness stand, that is the evidence.  What the

14   lawyers say is not evidence.

15        I want you to listen to the evidence or lack of

16   evidence.  I want you to have a critical mind and to ask

17   yourself:  Why didn't I hear this?  Why does this not

18   make sense?  Why is this puzzle not complete?  If there

19   are missing pieces of a puzzle and you don't have the

20   full picture in your mind, you have reasonable doubt,

21   your burden must be not guilty.

22        It is the Government's burden to prove to you

23   to get you this complete puzzle.  It's not enough for

24   them to just try to connect the dots in the direction of

25   Mr. Davis.  It's not enough for them to just try to

1   connect the dots and say, Well, it should have or could

2   you have and we think this is what it is.  That's not

3   enough.

4       Beyond a reasonable doubt is a very high

5   standard.  And I'll tell you this, they want you to

6   believe that Mr. Davis used a counterfeit access device

7   with intent to defraud.  I want you to pay attention with

8   that part, with intent to defraud.  You will hear the

9   jury instruction on what intent to defraud means.  For

10  somebody to get property or money from somebody, and that

11  doesn't mean taking property as, Hey, I'm living at your

12  place for free, or I'm just living there, I'm paying

13  rent.  It means, I'm taking your property or I'm taking

14  money from you, I'm defrauding you.

15      So I want you to listen to the evidence and

16  decide whether there was intent to defraud.  I also want

17  you to be aware that the evidence will show that the

18  property manager who is going to testify, Jeff

19  Jean-Pierre, is only the property manager.  They don't

20  collect rents.  They are not the owner of the

21  condominium.  The owner of the Unit 2004 was Marco

22  Chique, a Brazilian man who bought this place in February

23  of 2023.  He turned around and rented the place in April

24  of 2023.  He charged $13,000 a month for rent.  There is

25  absolutely no allegation that he is out of any money or

43

1    that the rent wasn't paid.

2          The Government wants you to believe that the

3    victim is this building, because they were defrauded

4    somehow.  The only sole purpose of this building is to

5    decide who comes in to live there, who's good enough to

6    live there, who is not.  That's the only purpose of them.

7          This is Alfred Davis.  He's presumed innocent.

8    And I think the Government is going to have a very

9    difficult time to put these pieces of a puzzle together.

10   And I'm not going to go into details in the opening.  I'm

11   going to let the Government present their evidence, and I

12   will speak to you in closing again.

13         I'm going to ask you to listen carefully about

14   what each witness has to stay.  I want you to keep an

15   open mind.  And I promise you that by the end of this

16   trial, you will find Mr. Davis not guilty of this crime.

17         Thank you.

18         THE COURT:  Thank you, ma'am.

19         Please call your first witness.

20         MR. BAILYN:  Thank you, your Honor.  The

21   Government calls Jeff Jean-Pierre.

22         Your Honor, I have a binder with the trial

23   exhibits.  May I present it to the Court?

24         THE COURT:  Sure.

25         Please come forward, sir.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1          MR. BAILYN:  Your Honor, can I put this in the

2  witness stand so I don't have to approach?

3          THE COURT:  You may.

4          Madam clerk, please swear the witness.

5          Please remain standing and raise your right

6  hand.

7          (Witness duly sworn.)

8          THE COURT:  Please be seated.  Get as close to

9  the microphones as you can.  Speak loudly.  Tell us your

10 name and spell it.

11         THE WITNESS:  My name is Jeff Jean-Pierre.

12 J-E-F-F --

13         THE COURT:  Wait just a second.  The

14 microphones, the thing you're talking into is a screen to

15 keep you from spitting on the microphone.

16         So talking into the screen isn't going to help.

17 It wasn't set up right.  I apologize.

18         Please speak loudly, tell us your name and

19 spell it.

20         THE WITNESS:  My name is Jeff Jean-Pierre.

21 First name is Jeff, J-E-F-F.  Last name Jean-Pierre,

22 J-E-A-N, P-I-E-R-R-E.

23         THE COURT:  You may proceed, sir.

24                 JEFF JEAN-PIERRE,

25 called as a witness herein, having been first duly sworn,

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    was examined and testified as follows:

2                         DIRECT EXAMINATION

3    BY MR. BAILYN:

4         Q.   Good afternoon, sir.

5              Will you tell us where you work?

6         A.   I work at 400 Sunny Isles Boulevard.

7         Q.   What's your role at 400 Sunny Isles?

8         A.   I am the assistant property manager.

9         Q.   What does that mean?

10        A.   I manage the building.  I'm below the property

11   manager.

12        Q.   And how long have you been with 400 Sunny

13   Isles?

14        A.   Since 2015.

15        Q.   When was 400 Sunny Isles built?

16        A.   In 2015.

17        Q.   And what kind of building is it?

18        A.   It's a condominium, high-rise condominium.

19        Q.   Is it owned by a company?  Is it owned by

20   individual owners?

21        A.   It's owned by individual owners.

22        Q.   So each unit is owned by an individual owner?

23        A.   Yes.

24        Q.   So what is your role?  Do you work for the

25   owners?  Do you work for the association?

1      A.    I work for the association, basically the

2   owners.

3      Q.    You have a binder with you.

4            Would you mind looking at Exhibit 14?

5      A.    Okay.

6      Q.    Do you recognize what you're looking at?

7      A.    Yes.

8      Q.    And what is it that you're looking at?

9      A.    It is the 400 Sunny Isles building.

10     Q.    Is that a fair and accurate description of how

11  400 Sunny Isles appeared in 2023?

12     A.    Yes.

13           MR. BAILYN:  Your Honor, I move to admit

14  Government Exhibit 14.

15           THE COURT:  Any objection?

16           MS. BOZANIC:  No objection.

17           THE COURT:  Without objection, 14 is admitted

18  in evidence.

19           (Government Exhibit 14 received in evidence.)

20           THE COURT:  I don't think that's straight.  The

21  arm has to be straight for that thing -- pull it all the

22  way up.  I think that's better.  Okay.

23           MR. BAILYN:  I'm used to computers, your Honor.

24  This is all new to me.

25           THE COURT:  You can do it on the computer, if

1    you want.

2         MR. BAILYN:  I'm having a little bit of a

3    technical difficulty, and I don't want to hold anything

4    up.

5         THE COURT:  We lost it.  You turned it off.

6         Okay.  There you go.  We lost the focus on it.

7    There you go.

8         MR. BAILYN:  All right.

9    BY MR. BAILYN:

10        Q.   So this is 400 Sunny Isles?

11        A.   Yes.

12        Q.   And this body of water, what body of water is

13   that?

14        A.   Oh --

15        Q.   I'm sorry.  I'm not pointing at it.

16             Here.  It's the bay?

17        A.   Yes.

18        Q.   All right.  I want to ask you just about some

19   of the things that 400 Sunny Isles has.

20             So I see that it has a tennis court --

21        A.   Yes.

22        Q.   -- is that right?

23        A.   That's correct.

24        Q.   Now, is that open to anybody off the street

25   or is it limited?

1      A.    It's limited only to the residents of 400 Sunny

2  Isles.

3      Q.    I also see a swimming pool.

4            Is that a swimming pool?

5      A.    Yes, that's a swimming pool.

6      Q.    Same question.

7            Is that open to anybody who wants it or is it

8  limited?

9      A.    It's limited to the residents of 400 Sunny

10 Isles only.

11     Q.    What are some of the other amenities that 400

12 Sunny Isles has?  For example, does it have a fitness

13 center?

14     A.    Yes, we do.

15     Q.    How about parking?

16     A.    Yes, we have a parking garage.

17     Q.    Valet services?

18     A.    Valet services as well.

19     Q.    Does it have package delivery?

20     A.    Yes, we do.

21     Q.    How about security, does it offer security?

22     A.    Yes, we do.

23     Q.    So I'd like to ask you just about the process

24 of someone becoming a resident at 400 Sunny Isles.

25            Can you take me through the steps that one

1    would go through before they can become an occupant or

2    resident?

3         A.    Before you become an occupant of the building

4    400 Sunny Isles, they usually come to the building and

5    ask for an application.  We ask them to fill it out.  And

6    then we tell them they need to bring their ID, their

7    Social, the check -- money orders or check, whatever they

8    want to bring.  And they have to bring the lease, the

9    leasing agreement between the owner and the tenant.

10        Q.    So there is a separate agreement between the

11   owner of the unit and the tenant?

12        A.    Yes.

13        Q.    And I think you mentioned then the approval

14   process is separate then with the residents and then the

15   condominium association?

16        A.    Yes, that is correct.

17        Q.    And you work for the condominium association?

18        A.    Yes.

19        Q.    As part of this approval process, does the

20   applicant have to go through a background check?

21        A.    Yes, the applicant go through a background

22   check.

23        Q.    And what does that background check look for?

24        A.    Financials, if they have a criminal history,

25   eviction.  That's about it.

1          THE COURT:  What do you mean by evictions?

2          THE WITNESS:  Let's say they were evicted from

3    prior, other buildings.

4          THE COURT:  Okay.

5    BY MR. BAILYN:

6       Q.   What is the purpose of conducting a background

7    check for applicants?

8       A.   The purpose of the background check for the

9    applicant is to -- is a requirement from the bylaws of

10   the building.  Everybody has to go through that process.

11      Q.   Well, let's say you do a background check for

12   someone, and it comes back without any spots.  It's

13   clean.

14          What happens next?

15      A.   We'll just go ahead and finish the application,

16   perhaps give the folder to the board members for them to

17   approve the application.

18      Q.   What if the background check comes what back

19   with something?  Let's say someone has an eviction

20   history or a criminal background or credit.

21      A.   It depends on the criteria.  If it's a small

22   eviction, it's been ten years, sometimes the board do

23   approve it.  But if it's something that -- if it's not --

24   if it's recent, the board will take a look and ask for

25   more proof.

1    Q.    So the information that comes back with the

2    background check is provided to the board?

3    A.    Yes.

4    Q.    They're the decisionmaker in the end?

5    A.    Yes.

6    Q.    Before performing a background check, do you

7    ask for someone's personal identifying information, which

8    is a long way of saying name, date of birth?

9    A.    We do ask for the ID, and then they provide a

10   Social Security in the application and they sign on it.

11   Q.    And why do you ask for someone's ID?

12   A.    Just to match the Social Security and to do the

13   background check.

14   Q.    Did the Government request documents from you

15   during this case?

16   A.    Yes.

17        MR. BAILYN:  Your Honor, the Government's filed

18   a notice of -- a 902.11 notice for Government Exhibits 1

19   through 8.  We move to admit those at this point.

20        THE COURT:  I have no idea what 902.11 is.

21        MR. BAILYN:  Certification of domestic records.

22        THE COURT:  Okay.  Is there any objection to

23   the certification of these records?

24        MS. BOZANIC:  Judge, there are relevance

25   objections on some of the exhibits.  I'm not sure if

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

```
 1        they're trying to introduce one by one.
 2               THE COURT:  But he's talking about
 3        authenticity, I belive, at this point.
 4               Are you not?
 5               MS. BOZANIC:  The authenticity, no.
 6               MR. BAILYN:  Your Honor --
 7               THE COURT:  I'm --
 8               MR. BAILYN:  -- I think they're all relevant,
 9        but we don't have to --
10               THE COURT:  Yeah, but we're not talking about
11        relevance at this point.  We're talking about
12        authenticity.
13               Do you have an objection to authenticity?
14               MS. BOZANIC:  No, your Honor.
15               THE COURT:  Now, the relevance, talk to me
16        about the relevance.
17               What are we talking about.
18               MR. BAILYN:  These are the property files for
19        Unit 903 and Unit 2004 that our witness collected from
20        the condominium association.
21               THE COURT:  And what is the number?
22               MR. BAILYN:  These are Exhibits 1 through 8.
23               MS. BOZANIC:  Judge, I have specific objections
24        regarding some of the exhibits.  Can we come sidebar?
25        There is a hearsay objection on one of them, and I would
```

1  | like --

2  |       THE COURT:  Tell me what your objections are

3  | because I thought said at the original --

4  |       MS. BOZANIC:  Judge, Exhibit Number --

5  |       THE COURT:  All right.  Hold on a second.

6  |       Ladies and Gentlemen of the Jury, if you will

7  | go back into the jury room, let us talk about this in

8  | open court.

9  |       I don't like it over here on the side.  It gets

10 | kind of confined.

11 |       COURT SECURITY OFFICER:  All rise for the jury.

12 |       (Jury exits at 2:01 p.m.)

13 |       THE COURT:  You may be seated.

14 |       Okay.  Door is closed.

15 |       What is your -- First of all, ground rules.  I

16 | need you to present whatever exhibits you have to the

17 | defense.  You know, I have the benefit of being able to

18 | talk to the jurors after the case, and the one thing they

19 | get really annoyed about is the lawyers getting together

20 | and whispering at each other and the judge sitting over

21 | here and talking to them.  They don't like that because

22 | they think they're being left out.

23 |       MR. BAILYN:  Your Honor, we provided the

24 | defense all the exhibits and told them each specific Rule

25 | of Evidence that we intended to introduce these exhibits

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    under.

2              THE COURT:  Okay, but, you know, then the

3    defense has to tell us before, we're going to object to 1

4    through 8 because of this reason.  Then we can deal with

5    it without the jury being -- we could have dealt with it

6    during the lunch break.  So let's do that from now on,

7    wherever we can.

8              What is your objection to 1 through 8?

9              MS. BOZANIC:  Judge, No. 5, Government's

10   Exhibit 5 has some checks.  One of the checks has a

11   handwritten note and a scratch over it that says bounced.

12   That is not relevant.  It's the third page of Exhibit 5.

13   It gives the appearance --

14             THE COURT:  Third page of Exhibit 5.  Hold on.

15   Let me find it.

16             Where does that bounced come from?

17             MR. BAILYN:  As noted in the Government's

18   notice, these are the records from the property

19   association.  That bounce is a handwritten annotation

20   because this check, indeed, bounced and an employee of

21   the property association wrote that in.

22             THE COURT:  He's prepared to testify to that?

23             MR. BAILYN:  He's provided a certification

24   that --

25             THE COURT:  And this is the record with the

1  word bounced on it in their records?

2         MR. BAILYN:  Yeah.  These are -- all the

3  records that are encompassed by the Government's notice

4  that was filed at ECF No. 12.

5         THE COURT:  Mr. Witness, do you know who put

6  the word bounced on there?

7         THE WITNESS:  I can't recall.

8         THE COURT:  Okay.  Was it you?

9         THE WITNESS:  I can't recall.  I don't

10  remember.

11         THE COURT:  Is this the way the record is in

12  your records, with this word on it?

13         THE WITNESS:  Which exhibit was it?

14         THE COURT:  Number 5, fourth page, or third and

15  fourth page, the one that says bounced on it.

16         THE WITNESS:  That's not my handwriting.

17         THE COURT:  Okay.  The question was, is this

18  the way is record is in your records, with this word on

19  it?  I didn't ask you if it was your writing.

20         THE WITNESS:  Say it one more time.

21         THE COURT:  Is this the way the record is in

22  the records of the association --

23         THE WITNESS:  Yes.

24         THE COURT:  -- with this word on it?

25         THE WITNESS:  Yes.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1           THE COURT:  Okay.  I'll admit it over objection.

2           (Government's Exhibit 5 received in evidence.)

3           THE COURT:  What else have you got?

4           MS. BOZANIC:  Judge, No. 3, the Brown's

5      Background Checks, the two --

6           THE COURT:  Exhibit 3?

7           MS. BOZANIC:  Yes, your Honor.

8           THE COURT:  What's the objection there?

9           MS. BOZANIC:  If you go to the last two pages,

10     there are copies of the IDs, it makes it seem like these

11     IDs were presented with the background check.

12          I know I received it in the discovery.  It

13     wasn't necessarily attached to the Brown's Background

14     Checks.  I think they're two different exhibits, and I

15     think the Government -- it gives the appearance that

16     these were submitted somehow by my client or somebody

17     with the Brown's Background Check.  They should be

18     separate exhibits.

19          MR. BAILYN:  I don't understand the objection,

20     your Honor.  The files were given to us.  They were

21     scanned.  These are individual pages.

22          THE COURT:  This is the file that was given to

23     you?

24          MR. BAILYN:  Yeah, 1 through 8 -- Yes, 1

25     through 8, your Honor.  We broke them up into exhibits to

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1  allow us to speak about individual packets of information

2  individually.  If the defense wishes --

3          THE COURT:  Are you saying that Exhibit 3 that

4  was given to you included these two items?

5          MR. BAILYN:  Exhibits 1 through 8 included

6  these two items.

7          THE COURT:  I didn't ask you that.  I asked you

8  if Exhibit 3 included this item.

9          MR. BAILYN:  So the Government was given a

10  batch of documents.  Let's say it was 50 documents.

11          THE COURT:  From whom?

12          MR. BAILYN:  Exhibit 1 would be Pages 1 through

13  10.  Exhibit 2 would be 10 through, let's say, 22.  We

14  broke up the documents into individual exhibits to allow

15  it to be easier to discuss each exhibit with the witness.

16          If the defense wants, we can call these two

17  documents Exhibit 3A.  We have no problem with that.

18          THE COURT:  Were they together when you got

19  them?  Where did you get them?

20          MR. BAILYN:  We got them from the witness, your

21  Honor, in a scanned file.

22          THE COURT:  This witness?

23          MR. BAILYN:  Right.

24          THE COURT:  You can cross-examine --

25  cross-examine him now and ask him where it came from.  I

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

```
 1   don't know.  I mean, I'm not clairvoyant.  I have no way
 2   of knowing that.
 3              MS. BOZANIC:  Judge, I can tell you that in the
 4   discovery that I received, they weren't next to each
 5   other.  There were other papers in between.  What I'm
 6   saying is that the Government put them together and made
 7   them into one exhibit.
 8              THE COURT:  I'm giving you the opportunity to
 9   cross-examine him --
10              MS. BOZANIC:  Yes.  May I proceed?
11              THE COURT:  -- now, examine him now, and
12   determine what you're able to determine.
13              MS. BOZANIC:  Thank you, your Honor.
14              May I go up to the lectern?
15              THE COURT:  Of course.
16                        CROSS-EXAMINATION
17   BY MS. BOZANIC:
18       Q.   Mr. Jean-Pierre, do you have all the exhibits
19   in front of you?
20              THE COURT:  Yes, he has the folder that has all
21   the exhibits.
22   BY MS. BOZANIC:
23       Q.   Can you please turn to Exhibit No. 3?
24       A.   I'm there.
25       Q.   Okay.  If you look at the Brown's Background
```

| | |
|---|---|
| 1 | Check, do you specifically remember this document being |
| 2 | in the folders that you provided to the Government? |
| 3 | A.    Which one exactly? |
| 4 | Q.    That would be the Brown's Background Check, if |
| 5 | you look at the first page of Government's Exhibit 3, and |
| 6 | you keep going, do you recall this document being in the |
| 7 | documents that you provided to the Government? |
| 8 | THE COURT:  Are we talking about the fifth or |
| 9 | sixth page?  The one that has the picture of a driver's |
| 10 | license? |
| 11 | MS. BOZANIC:  I'm talking about the first five |
| 12 | pages first, and then I'll get to Page 6 and 7. |
| 13 | THE COURT:  Okay.  Because there is nothing |
| 14 | Brown -- it says Brown's Background Checks. |
| 15 | MS. BOZANIC:  Yes, your Honor. |
| 16 | THE COURT:  You're not talking about the color |
| 17 | brown, you're talking about the name Brown's.  Okay. |
| 18 | BY MS. BOZANIC: |
| 19 | Q.    I was just naming the document.  It's titled, |
| 20 | Brown's Background Check. |
| 21 | Do you see that? |
| 22 | A.    Yes. |
| 23 | Q.    Did you provide this to the Government? |
| 24 | A.    Yes. |
| 25 | Q.    Okay.  And when you provided these documents, |

1   were these two IDs there, Pages 6 and 7, attached to this

2   Brown's Background Check or were they somewhere randomly

3   in the package of many documents you provided to the

4   Government?

5        A.    They were on the other side of the folder.

6        Q.    Meaning they were not attached to the Brown's

7   Background Check, correct?

8        A.    What exactly do you mean because this -- it was

9   one folder.  The ID is on a different side, and the

10  background check is on a different side.  It's right --

11       Q.    So there were two separate folders?

12       A.    No, no; one folder.  It's right below each

13  other.

14            THE COURT:  He said there was one folder and it

15  was in the same folder.

16            THE WITNESS:  In the same folder.

17  BY MS. BOZANIC:

18       Q.    What other documents did you have in that

19  folder?  How many pages, approximately, would you have in

20  that folder?

21       A.    There was a lot of pages.  I can't recall.

22       Q.    Okay.

23       A.    About 40 to 50 pages in total.

24       Q.    Okay.  Can you tell this Court for sure that

25  these two driver's licenses were right next to the

1  Brown's Background Check or is it possible they were just

2  in those 50 pages?

3       A.    They were -- they were on the same side as the

4  background check.  Background check is on the top, and ID

5  should be at the bottom.

6       Q.    And there were some documents in between,

7  correct?

8       A.    It depends on who filed it.  I can't recall.

9  But we usually put background check first and IDs at the

10  bottom, I believe.

11       Q.    But can you tell us with specificity -- are you

12  sure that there were no documents in between these two?

13            THE COURT:  I'm not sure -- What difference

14  does it make if there were documents in between?  He is

15  saying that the background check was placed in one part

16  and that the IDs were placed at the bottom.

17            So what difference does it make if there were

18  other documents in between?

19            MS. BOZANIC:  Judge, because there were, like,

20  let's say, 50 pages that were provided.  This Brown's

21  Background Check didn't come with these two IDs.  I think

22  it gives the appearance to the jury that these two IDs

23  were attached to the Brown's Background Check.

24            THE COURT:  Well, I think you can communicate

25  that to the jury just the same way you have just done,

1    which is he doesn't know whether they were placed on the

2    front or placed in the back.  I just don't know what

3    difference it makes.

4              MS. BOZANIC:  Judge, I can tell you I got it in

5    the discovery.  There were documents in between.  It just

6    makes it seem -- like I said, I'm not going to go in

7    circles, but it just gives --

8              THE COURT:  You know, I would assume that they

9    have some evidence that these photo IDs were used at some

10   point for the purpose of the background check, so I don't

11   think it matters whether they were in the front or in the

12   back or sideways.  They were in the same folder.  I just

13   don't understand the significance of it.  Although I can

14   understand your wanting to make it significant, I don't

15   see the significance.  And I don't think that that makes

16   it inadmissible.  It is something that you can develop on

17   cross-examination.

18             MS. BOZANIC:  Judge, the other thing I would

19   note is that Cynthia Louis' background check has the full

20   background check with the credit report, and it's about

21   four pages.  And then there is only one page of Rod

22   Lesperance.  There is also, in this 2003, no proof that

23   he signed anything saying that it was okay to run his

24   background check.

25             THE COURT:  So what?

| | |
|---|---|
| 1 | MS. BOZANIC:  So the fact that these two IDs |
| 2 | are on the back of this background check gives it the |
| 3 | appearance that somehow my client provided this to |
| 4 | somebody and had this ran -- |
| 5 | THE COURT:  Isn't that what this trial is all |
| 6 | about, that he provided these IDs?  And if they can't say |
| 7 | that he provided the IDs, don't you win?  I mean, they |
| 8 | have to have somebody say he provided these IDs for the |
| 9 | purpose of the background check; don't they? |
| 10 | MS. BOZANIC:  Judge, that's fine.  I'll just |
| 11 | cross-examine on the issue when it comes up. |
| 12 | Thank you. |
| 13 | THE COURT:  Yeah, okay. |
| 14 | All right.  At this point, I'll overrule your |
| 15 | objection. |
| 16 | MR. BAILYN:  Your Honor, we would then ask to |
| 17 | introduce Government Exhibits 1 through 8. |
| 18 | THE COURT:  1 through 8 are admitted over |
| 19 | objection.  Please bring the jury back in and I'll offer |
| 20 | it again in front of the jury. |
| 21 | (Government Exhibits 1-8 received in evidence.) |
| 22 | COURT SECURITY OFFICER:  All rise for the jury. |
| 23 | (Jury enters at 2:13 p.m.) |
| 24 | THE COURT:  Please proceed. |
| 25 | DIRECT EXAMINATION |

| | |
|---|---|
| 1 | (Resumed) |
| 2 | BY MR. BAILYN: |
| 3 | Q.    Mr. Jean-Pierre, when we were last speaking I |
| 4 | was asking you about the process of the background check. |
| 5 | And I asked if the condominium association required that |
| 6 | a person provide a driver's license. |
| 7 | A.    Yes. |
| 8 | Q.    Why do they ask for that? |
| 9 | A.    To match the person face with the -- |
| 10 | THE COURT:  Actually, he said they had to |
| 11 | provide identification.  I don't think he said a driver's |
| 12 | license. |
| 13 | MR. BAILYN:  I'm sorry.  Identification. |
| 14 | BY MR. BAILYN: |
| 15 | Q.    The condominium association requires somebody |
| 16 | to provide identification? |
| 17 | A.    Yes. |
| 18 | Q.    What types of identification? |
| 19 | A.    ID or passport. |
| 20 | Q.    And why do they ask for that? |
| 21 | A.    To make sure the person -- that is the person |
| 22 | they say they are. |
| 23 | Q.    Is it a regular course or practice to then keep |
| 24 | a copy of that driver's license that's provided? |
| 25 | A.    Yes. |

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1       Q.    And where is that copy kept?

2       A.    In a folder in the office with all the

3  background checks and everything, application and

4  everything together.

5       Q.    So how are the folders organized in the office?

6  Is it by unit?  Is it by date?

7       A.    By unit.

8       Q.    Were you asked to provide folders or files to

9  the Government in this case?

10      A.    Yes.

11      Q.    And was that for particular units?

12      A.    Yes.

13      Q.    And which units were those?

14      A.    2004 and 903.

15      Q.    Okay.  Do you know someone who goes by the name

16  of Rod Lesperance?

17      A.    Yes.

18      Q.    And how do you know him?

19      A.    He came to the building to drop off an

20  application.

21      Q.    When was that?

22      A.    2018.

23      Q.    How did you come to learn that his name was Rod

24  Lesperance?

25      A.    When they came to drop off the application.

```
 1        Q.    Did he introduce himself to you as Rod
 2   Lesperance?
 3        A.    I don't recall, but I believe he came and --
 4              MS. BOZANIC:  Objection; hearsay.
 5              MR. BAILYN:  It's a statement by the --
 6              THE COURT:  I don't believe that it's hearsay.
 7   There are a lot of --
 8              MS. BOZANIC:  And no personal knowledge.
 9              THE COURT:  Their allegation is that it's the
10   same person that's sitting next to you, so that would not
11   be hearsay.
12              MS. BOZANIC:  Judge, the objection, no personal
13   knowledge.  He was about to speculate, I believe.
14              THE COURT:  Yeah, I don't want you guessing.
15   If you don't know, you don't know.
16              Did he introduce himself to you as Rod
17   Lesperance, whatever the name is?
18   BY MR. BAILYN:
19        Q.    The application that you mentioned, which unit
20   was that for?
21        A.    903.
22        Q.    And you provided documents for Unit 903 to the
23   Government?  You had said that earlier?
24        A.    Yes.
25        Q.    I'd like to show you some of those.
```

| | |
|---|---|
| 1 | MR. BAILYN:  One moment, your Honor. |
| 2 | Your Honor, is there a way to pull it up |
| 3 | without breaking it? |
| 4 | THE COURT:  You better not break it.  I don't |
| 5 | think your budget is big enough to break it. |
| 6 | MR. BAILYN:  I do not doubt that. |
| 7 | THE COURT:  What is it you're trying to do? |
| 8 | MR. BAILYN:  I'm just trying to zoom out a |
| 9 | little bit so that we can -- |
| 10 | THE COURT:  You can zoom out without lifting it |
| 11 | up. |
| 12 | MR. BAILYN:  We won't see the whole document, |
| 13 | though. |
| 14 | THE COURT:  It zooms. |
| 15 | MR. BAILYN:  I know.  I zoomed up, I just |
| 16 | wanted to be able to see the whole document.  If I can |
| 17 | maybe move it up a little bit, if that's doable. |
| 18 | THE COURT:  Probably should have done that |
| 19 | before the trial started. |
| 20 | MR. BAILYN:  Your Honor, I usually rely on my |
| 21 | computer, but you know what, we're going to wing it. |
| 22 | THE COURT:  Do it on your computer then. |
| 23 | MR. BAILYN:  I'm having a problem, your Honor. |
| 24 | BY MR. BAILYN: |
| 25 | Q.    I'm going to start with the top of this |

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    document.  It's dated October 19, 2018.  It says 400

2    Sunny Isles.

3            What is this document?

4       A.   I don't see anything.

5            MR. BAILYN:  Your Honor, can the witness be

6    shown what -- this is Government Exhibit 6.

7            THE COURT:  Look at the screen.

8            THE WITNESS:  I see it now.

9            THE COURT:  It's being shown to him.  He's just

10   not looking at the screen.

11   BY MR. BAILYN:

12      Q.   Can you explain to the jury what this document

13   is?

14      A.   This is approval letter.

15      Q.   What is this approval for?

16      A.   For Unit 903.

17      Q.   How do you know it's for Unit 903?

18      A.   Because it says 400 Sunny Isles Boulevard, Unit

19   903.

20      Q.   I think your screen is touch screen.

21           Do you mind circling where it says 903?

22      A.   (Witness complies.)

23      Q.   Do you recognize the signatures on this page?

24      A.   Yes.

25           THE COURT:  That's a lousy circle.

1          THE WITNESS:  Sorry.

2    BY MR. BAILYN:

3       Q.    Is there an arrow in circle function?

4          THE COURT:  You just have to go around and it

5    will circle it.

6          THE WITNESS:  Is that better?

7          THE COURT:  Okay.

8    BY MR. BAILYN:

9       Q.    It's better.  I think it gets the point.

10          Do you recognize any of the signatures on that

11   page?

12      A.    I recognize my signature.

13      Q.    Where is your signature?

14      A.    The witness.

15      Q.    Do you mind just pointing that out?

16      A.    (Witness complies.)

17      Q.    Before this approval was done, before you

18   signed this approval, would you have requested a

19   background check?

20      A.    Yes.

21      Q.    And I see that the name here is Rod Lesperance.

22          Would you have requested a background check for

23   Rod Lesperance?

24      A.    Yes.

25      Q.    Before you do a background check on someone, do

1    they have to authorize the use of their information?

2         A.    Yes.

3              THE COURT:  Are all of your screens working?

4    Let me know if any of them go out, which happens fairly

5    often.

6    BY MR. BAILYN:

7         Q.    I'm showing you -- I'm continuing with

8    Government Exhibit 6.  It says, Authorization to release

9    Brown's Background Checks.

10             Who would have filled out this authorization?

11        A.    The applicant.

12        Q.    That's not your handwriting?

13        A.    No.

14        Q.    Date of birth.

15             Who would have filled that out?

16        A.    The applicant.

17        Q.    As well as the Social Security number?

18        A.    Yes.

19        Q.    All right.  You provided us the file for Unit

20   903.

21             Would a copy of the driver's license provided

22   before doing this background check been included in that

23   file?

24        A.    Yes.

25             THE COURT:  What is the yellow paper on there?

1           MR. BAILYN:  This is the way it was received by

2    the Government, your Honor, so we didn't want to alter

3    anything.

4           THE COURT:  What's that yellow paper?  What's

5    that yellow paper on there?

6           THE WITNESS:  It's basically add-on paper, add-

7    on application.

8           THE COURT:  Okay.  Add-on paper, meaning what?

9    Additional paper for what, for the application?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  It just didn't make any

12   sense.  I didn't understand what it meant.

13          All right.  Go ahead.  Move on.

14   BY MR. BAILYN:

15       Q.   Showing you a driver's license.  This is the

16   document that was included in Unit 903?

17       A.   Yes.

18       Q.   I will zoom in.

19            What is the name on this driver's license?

20       A.   Rod Lesperance.

21       Q.   And the date of birth?

22       A.   12/04/1975.

23       Q.   Okay.  Was a background check run on Rod

24   Lesperance in 2018?

25       A.   Yes.

1    Q.    All right.  And continuing to show you

2    Government's Exhibit 6, can you describe for us what that

3    document is?

4    A.    This is a background check from Brown's

5    Background Checks.

6            THE COURT:  Keep your voice up, please.

7            THE WITNESS:  Okay.

8    BY MR. BAILYN:

9    Q.    Does this background check document indicate

10   when the background check was run?

11   A.    Yes.

12   Q.    And when was that?

13   A.    10/19/2018.

14   Q.    Okay.  I'd like to go through, just quickly --

15   I see the subject Rod Lesperance.

16           What does that mean in these background checks?

17   A.    That is the name of the applicant.

18   Q.    And the date of birth?

19   A.    12/04/1975.

20   Q.    The first thing we see is -- excuse me --

21   Scoring and then Credit Summary Form.

22           Do you do background checks for credit reports?

23   A.    Yes.

24   Q.    On the next page we see:  Evictions nationwide,

25   no evictions nationwide found.

1          Was this background check done for evictions as

2     well?

3          A.     Yes.

4          Q.     And then I see Search on name Lesperance for

5     comprehensive criminal search.

6                 Was a criminal background check done?

7          A.     Yes.

8          Q.     What were the results of that criminal

9     background check?

10         A.     It says, No criminal background check found.

11         Q.     I'm showing you a driver's license, yet again.

12                Looking at that picture, do you recognize the

13    person in that picture>, not here, but do you recognize

14    him from 2018?

15         A.     Yes.

16         Q.     That's somebody you met in person?

17         A.     Yes.

18         Q.     And what did he call himself?

19         A.     Rod Lesperance.

20         Q.     How long have you known this person as Rod

21    Lesperance?

22         A.     The day he dropped the application off, 2018.

23         Q.     When did you find out that he may have a

24    different name?

25         A.     This year, I believe, or last year.  I don't

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

 1    recall.

 2        Q.   What was the context in which you learned that

 3    he may have a different name?

 4        A.   Because an FBI agent came and told us.

 5             MS. BOZANIC:  Objection; hearsay.

 6             THE COURT:  I'll sustain the objection.  That

 7    is hearsay.

 8    BY MR. BAILYN:

 9        Q.   Was it in the context of an investigation?

10        A.   Say it one more time.

11        Q.   It's fine.  We'll leave it.

12             I asked you about Unit 903.  Now I want to ask

13    you about Unit 2004.

14             THE COURT:  I don't like to keep the jury in

15    the dark.  I'm sure you have heard hearsay many times on

16    television.  Probably once or twice it was actually right

17    what they said.  Hearsay is an out-of-court statement

18    being repeated in court.  And the reason it doesn't

19    usually come in is because you have no chance to

20    cross-examine to see if the man's seeing eye dog had been

21    left at home, or if he was legally blind or if he was

22    looking into the sun or something like that.  So you

23    don't have a chance to test his statement if he's not the

24    person saying it.

25             On the other hand, there are some indicia of

1    reliability.  This doesn't happen to have them.  But

2    testimony at a former trial, the admission of a party

3    opponent, statement against interest, spontaneous

4    statement, excited utterance, records of past

5    recollections, business records, those are all exceptions

6    because there is a reason that those are probably more

7    believable and that just a regular out-of- court

8    statement.  So this doesn't happen to fit into any of

9    those categories, so I did not admit it.  It's not a big

10   mumbo-jumbo or a big complicated thing.  It's just an

11   out-of-court statement being introduced into court for

12   its truth.

13             You may proceed.

14             MR. BAILYN:  Thank you, your Honor.

15             THE COURT:  It's a free evidence lesson to the

16   jury.

17   BY MR. BAILYN:

18        Q.    Beyond Unit 903, did the person who you knew as

19   Rod Lesperance attempt to live in another unit at 400

20   Sunny Isles?

21        A.    Yes.

22        Q.    What unit was that?

23        A.    2004.

24        Q.    Did you provide to the Government the property

25   file for Unit 2004?

1      A.    Yes.

2      Q.    I'd like to show you what's been admitted as

3  Government Exhibit 1.  In your binder, would you mind

4  going to the second page of Government Exhibit 1.

5            You mentioned to us that the process is that a

6  person would lease an apartment from an owner, and then

7  would get approval from the condominium association; is

8  that right?

9      A.    That's correct.

10     Q.    Does the condominium association that you work

11 for keep or review a copy of that lease?

12     A.    Yes.

13     Q.    All right.  So I'm showing you what's been

14 marked as Government Exhibit 1.  This is the second page.

15 It says:  Residential lease for apartment.

16           The condominium -- excuse me.  The condominium

17 association, as I mentioned, keeps a copy of the lease?

18     A.    Yes.

19     Q.    And who is the lessee for this unit?

20     A.    Cynthia Louis.

21     Q.    And where do we see that?

22     A.    Right here (indicating).

23     Q.    And what is the unit number that's being

24 leased?

25     A.    2004.

1            THE COURT:  Can I ask you to circle her name

2    with your finger because I want to see if this is not

3    working.  I want to get it fixed.

4            Have you circled it?

5            THE WITNESS:  I did.

6            THE COURT:  So it's not working.  Okay.  So

7    we'll just have to go with the arrows.  Please get that

8    fixed, Iris.  I don't mean right now.  I mean overnight.

9            MR. BAILYN:  May I continue, your Honor?

10           THE COURT:  You may proceed.

11   BY MR. BAILYN:

12       Q.   Cynthia Louis is the lessee for Unit 2004?

13       A.   Yes.

14       Q.   Showing you what's been marked as Government's

15   Exhibit 4, you can pull -- you can see it on the screen

16   or you can look at it in your binder.  It says 400 Sunny

17   Isles at the top.

18           Is this document a document for the individual

19   owner or is it a document that's for the condominium

20   association?

21       A.   For the building.

22       Q.   And for which unit is this document related to?

23       A.   2004.

24       Q.   We see that here; is that right?

25       A.   Yes.

```
1        Q.    I'll show you the next page.  It says:

2   Occupancy, Rod Lesperance and Cynthia Louis.

3              What does that mean, occupancy?

4        A.    They are going to be the tenant of the unit.

5        Q.    I'm sorry.  What was that?

6        A.    They're going to be tenant of that unit.

7   They're going to be living in that unit, 2004.

8        Q.    Okay.  Before somebody is added as a tenant for

9   a unit, do they have to go through a background check?

10       A.    Yes.

11       Q.    Did you have a discussion with the person you

12  knew to be Rod Lesperance about the need to go through a

13  background check?

14       A.    Um.

15       Q.    Let me ask the question differently then.

16       A.    Okay.

17       Q.    Before Rod Lesperance becoming an occupant, did

18  you talk to him?

19       A.    Yes.

20       Q.    What did you talk to him about?

21       A.    That he would need to redo the application to

22  be a tenant in the building again.

23       Q.    The person that you recognize as Rod

24  Lesperance, you told him that he needed to redo the

25  application?
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1      A.    Yes.

2      Q.    Showing you what's been marked as Government

3 Exhibit 2, this is dated April 17, 2023.  This looks

4 similar to another document.

5            But would you mind explaining to us what this

6 document is?

7      A.    This is a -- the letter of approval.

8      Q.    And who is approval granted to?

9      A.    Cynthia Louis and Rod Lesperance.

10      Q.    Before this approval, there would have been a

11 background check done?

12      A.    Yes.

13      Q.    Now, before doing a background check, would

14 someone request identification?

15      A.    Yes, someone would request identification.

16      Q.    Is that identification kept in the file?

17      A.    Yes.

18      Q.    I show you Government Exhibit 3.

19            Is this a photocopy of identification that was

20 kept in the file?

21      A.    Yes.

22      Q.    And who is this identification for?

23      A.    It says Cynthia Louis.

24      Q.    Is that one of the people who was approved?

25      A.    Yes.

1        Q.    Okay.  I'm showing you another document.

2              Is this a photocopy of a driver's license that

3    was kept in the file?

4        A.    Yes.

5        Q.    And who is this for?

6        A.    For Rod Lesperance.

7        Q.    And the date of birth, if you can see it?  I

8    can turn it sideways.

9        A.    12/04/1975.

10       Q.    Okay.  I want to ask you something about this

11   document.  I notice on the side here it says:  Mail

12   Yadalyn Monteste, Outlook.

13             Can you explain what that means?

14       A.    This document came from an email.

15       Q.    Do you know who Yadalyn Monteste is?

16       A.    Yes.

17       Q.    Who is she?

18       A.    She was the front desk lead of 400 Sunny Isles.

19             THE COURT REPORTER:  She was the --

20             THE COURT:  She was the what?

21             THE WITNESS:  Front desk lead of 400 Sunny

22   Isles.

23   BY MR. BAILYN:

24       Q.    Was she an employee of the same organization

25   that you are --

1      A.     Yes.

2      Q.     -- an employee of?

3             Does he she work at 400 Sunny Isles anymore?

4      A.     She no longer work there.

5      Q.     Okay.  Finally, I show you what was in the

6   file.  This is, again, Brown's Background Check.

7             What was the date that this background check

8   was requested?

9      A.     4/13/2023.

10     Q.     What was the name?

11     A.     It say Rod Lesperance.

12     Q.     I see -- you were not the one who requested

13  this background check -- excuse me.

14            Were you the one who requested this background

15  check?

16     A.     No.

17     Q.     It says Rob Lesperance and we have seen this ID

18  that says Rod Lesperance.  I think you mentioned that you

19  knew the defendant as Rod Lesperance.

20            Do you know why it says Rob Lesperance here?

21     A.     I believe it would be a typo.

22     Q.     Either way, was there a criminal search done?

23     A.     Yes.

24     Q.     Based on this background check, though, was an

25  eviction report done?

1    A.    No.

2    Q.    How about a credit history?

3    A.    No.

4    Q.    What is the only thing that was searched for in

5    this background check?

6    A.    Criminal, sex offender, nationwide and

7    international.

8    Q.    And did this come back clean?

9    A.    Yes.

10         MR. BAILYN:  Okay.  A moment, your Honor, to

11   confer with my partner.

12         THE COURT:  Go right ahead.

13   BY MR. BAILYN:

14   Q.    So after this background check was done -- I

15   want to ask a question.

16         Just looking at this driver's license, is this

17   Cynthia Louis, the lessee?

18   A.    Say it one more time.

19   Q.    You mentioned this was Cynthia Louis, the name

20   on the lease?

21   A.    Yes.

22   Q.    How often are you at Unit 2004 -- excuse me, at

23   400 Sunny Isles?

24   A.    How often I am -- all the time, Monday through

25   Friday.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1      Q.    Have you ever seen this woman before?

2      A.    No.

3      Q.    Okay.  Now, let's assume that someone had

4   provided a fraudulent driver's license.

5            Would that be a cause for the condominium

6   association to take action?

7            MS. BOZANIC:  Objection; speculation.

8            THE COURT:  I'll permit this.  Overrule the

9   objection.

10            THE WITNESS:  Repeat the question.

11   BY MR. BAILYN:

12      Q.    If someone -- based on your experience and as

13   the assistant property manager, if someone had provided a

14   fraudulent driver's license, for example, is that a

15   reason for the condominium association to take action,

16   such as eviction?

17      A.    It depends.  If we realize it's a fraudulent

18   ID, we would not accept the application.

19      Q.    Have there been any eviction proceedings that

20   have begun in this case?

21            MS. BOZANIC:  Objection; relevance.

22            THE COURT:  Overruled.

23            THE WITNESS:  No.

24   BY MR. BAILYN:

25      Q.    Do you know why not?

1      A.    I'm not quite sure.

2      Q.    Is that decision made by you or the condominium

3  association above?

4      A.    That would be the condominium association.

5            MR. BAILYN:  Thank you.

6            No further questions, your Honor.

7            THE COURT:  Cross-examination.

8            MS. BOZANIC:  Thank you, your Honor.

9            Judge, I'm just looking for the actual evidence

10 that was introduced so I can show the jury the copies --

11           THE COURT:  Okay.

12           MS. BOZANIC:  -- if I can have a moment.

13           MR. BAILYN:  We introduced Exhibits 1 through 8.

14           MR. DOMINGUEZ:  It's not that.  You have to

15 give her the actual exhibits.  Give her the exhibits.

16                        CROSS-EXAMINATION

17 BY MS. BOZANIC:

18     Q.    Good afternoon, Mr. Jean-Pierre.

19     A.    Good afternoon.

20     Q.    You testified today about Rod Lesperance,

21 R-O-D, correct?

22     A.    R-O-D?

23     Q.    Yes, Rod Lesperance.

24     A.    R-O-D, like dog, yes.

25     Q.    Did you also refer to the same person as Rob on

1   numerous occasions?

2       A.    That's what I was reading.

3       Q.    So did you -- is the answer yes?  Did you refer

4   to this person as Rob, R-O-B?

5       A.    From what I was reading, yes.

6       Q.    I'm talking about different occasions before

7   today.

8             Did you think this person's name was Rob?

9       A.    Repeat the question again.

10      Q.    Before today, did you refer to this person as

11  Rob, R-O-B?

12      A.    No.

13      Q.    Do you remember speaking to my investigator and

14  calling this person Rob and not Rod?

15      A.    Pronunciation, I would say that, yes.

16      Q.    Okay.  Prior to the Government speaking to you

17  about this case, did you even know this person's last

18  name or did you just know him as Rob?

19      A.    Rod Lesperance, because I did the background

20  check.

21      Q.    Now, you did the background check on the 2018,

22  correct?

23      A.    Yes.

24      Q.    And you can't tell the jury that you ever

25  received any driver's license from Mr. Davis here,

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    correct?

2        A.   Say it one more time.

3        Q.   You, yourself, never received a copy of a

4    driver's license?  It wasn't handed to you by Mr. Davis,

5    correct?

6        A.   I received a driver's license from Rod

7    Lesperance.

8        Q.   In which year?

9        A.   2018.

10       Q.   In 2023, you were not present and you have no

11   idea how this driver's license got there, correct?

12           MR. BAILYN:  Objection; compound, your Honor.

13           THE COURT:  It is compound.

14           MS. BOZANIC:  I'll rephrase, Judge.

15   BY MS. BOZANIC:

16       Q.   In 2023 --

17       A.   Okay.

18       Q.   -- you did not receive a copy of the driver's

19   license in the name of Rod Lesperance, correct?

20       A.   2023 you said?

21       Q.   Yes.

22       A.   I was not doing -- running -- doing the

23   application.

24       Q.   I'm going to show you Government's Exhibit 3,

25   part of the Exhibit 3.

1          I'm zooming out so you can see the whole

2     document.  So Government's Exhibit 3, which is the

3     driver's license of Rod Lesperance, shows that it came

4     from an Outlook mail of Yadalyn Monteste, correct?

5          A.   Yes.

6          Q.   You have no idea how she got that, correct?

7          A.   From the Outlook mail.

8          Q.   Okay.  But you were not present and you can't

9     testify to the jury how this person, Yadalyn Monteste,

10    got this ID and who provided it to her, correct?

11         A.   Correct.

12         Q.   Okay.  You cannot testify as to whether a

13    realtor dropped it off or somebody else emailed it,

14    correct?

15         A.   I can't recall, no.

16         Q.   Did the Government ask you to try to help him

17    finds Yadalyn Monteste when they spoke to you about this

18    case?

19         A.   Say it one more time.

20         Q.   Did the Government ever ask you to help them

21    find Yadalyn Monteste when they spoke to you about this

22    case?

23         A.   No.

24         Q.   Now, you are just a property manager, or you

25    just work for the property manager's office, correct?

1    A.    Yes.

2    Q.    You don't collect rent?

3    A.    No.

4    Q.    You have nothing to do with collecting any type

5    of money on behalf of the owner of this condominium,

6    correct?

7    A.    No.

8    Q.    You mentioned something about seeing certain

9    tenants or you spoke specifically about Cynthia Louis and

10   the fact that you never saw her, correct?

11   A.    Yes.

12   Q.    Do you see every single person that comes in

13   and out from all these condominiums in this big building?

14   A.    Yes.

15   Q.    You see every single person?

16   A.    Yes.

17   Q.    Do you know every single person by their name?

18   A.    Not quite sure, no.

19   Q.    Do you know who Marco Chique?

20   A.    Yes.

21   Q.    Who is Marco Chique?

22   A.    The owner of the unit.

23   Q.    Of Unit two thousand --

24   A.    Four.

25   Q.    -- four, correct?

1      A.    Yes.

2      Q.    And Marco Chique bought the unit in February of

3  2023, correct?

4      A.    That's correct.

5      Q.    Okay.  And he bought it under the name of a

6  company called Miami 2023 at 400 Sunny Isles, LLC, right?

7      A.    That's correct.

8      Q.    And that company, even though it has the name

9  of 400 -- it has the word 400 Sunny Isles in its name,

10  has nothing to do with your property management, correct?

11      A.    No.

12      Q.    And you know that this is the person who

13  collects rent for the unit, right?

14      A.    I would not know that.

15      Q.    Okay.  Let me rephrase it.

16            You, as the property manager, have nothing to

17  do with collection of the rent?

18      A.    That's correct.

19      Q.    Because you don't own the unit?

20      A.    Yeah.

21      Q.    Let's talk about Government's Exhibit 6 that

22  was shown to you earlier.  This is the certificate of

23  approval from 2018.

24      A.    Yes.

25      Q.    And you said your signature is the one as the

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

 1  witness?

 2      A.   Yes.

 3      Q.   Why is this document not notarized?

 4      A.   Why is it not notarized?  It was an add-on, and

 5  usually add-on we don't notarize it since it's an add-on.

 6      Q.   Okay.  Now let me show you something else, also

 7  part of Exhibit 6, Government's Exhibit 6.  There is an

 8  application for authorization to release, and then we

 9  can't see the rest of it, but it's basically -- Can you

10  tell me what this paper is?

11      A.   This is add-on paper, add-on application,

12  basically.

13      Q.   What is this whole document, authorization to

14  release what?

15      A.   To release their information.

16      Q.   And for somebody to have their background

17  checked, they have to sign an authorization saying, Go

18  ahead and run a background, correct?

19      A.   Yes.

20      Q.   And in this case, you're saying Rod Lesperance

21  signed it?

22      A.   Yes.

23      Q.   Right?

24      A.   Yes.

25      Q.   But you didn't watch him sign this, correct?

1    A.    They just -- they usually just drop off the

2    application.  They don't --

3    Q.    Okay.

4    A.    -- sign it in front of us.

5    Q.    Can you, with specificity, tell us who dropped

6    off the application in 2018, whether it was a realtor or

7    somebody else?

8    A.    This was add-on, so I believe he dropped it

9    off.

10   Q.    You believe.

11         Can you tell this jury for sure that you know

12   who dropped off this application in 2018, five years ago?

13   A.    Five years ago I won't remember, so that's why

14   I said he probably dropped it off because it was an

15   add-on to the --

16   Q.    I don't want you to speculate and tell me

17   probably.  I am asking you:  Do you know.

18   A.    I don't recall.

19   Q.    Now, if there's a typo in the background check

20   such as Rob Lesperance.

21         Obviously, that would affect the search,

22   correct?

23         MR. BAILYN:  Objection; foundation.

24         THE COURT:  I don't know.  If he knows he can

25   answer.

```
1    BY MS. BOZANIC:

2        Q.   Do you want me to repeat the question?

3        A.   Yes, please.

4        Q.   If there's a typo in the name that somebody

5    inputs when they run the background check, such as Rob as

6    opposed to Rod, there will be a big difference, right?

7    The search would be different.

8        A.   It depends.

9        Q.   What does it depend on?

10       A.   If we do have a Social and the name is wrong,

11   the background check company will tell us the name was

12   wrong.  But if there was no Social, it will come out

13   different.

14       Q.   Now, in 2018, the background check for Rob

15   Lesperance was ran and it included the evictions and the

16   credit report and the background check, correct?

17       A.   Yes.

18       Q.   And in 2023, it was only the background check,

19   right?

20       A.   Yes.

21       Q.   Who decides what's run, if it's the whole

22   thing, all three, or just the background check?

23       A.   Who decide?

24       Q.   Yes.

25       A.   We don't decide.
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

```
1       Q.    So can you explain why in 2023 there is only a

2  background check ran as opposed to the whole credit

3  report and evictions?

4       A.    Which exhibit is it?

5       Q.    I am just talking generally speaking when you

6  run a background check.

7       A.    No, I'm saying, which exhibit is the page --

8       Q.    I'm sorry?

9       A.    -- for the background check?

10      Q.    I wasn't asking about a specific exhibit.  I

11 was saying when you run a background check, who decides

12 whether you run all three or just one?

13      A.    We don't decide.

14      Q.    I'm sorry?

15      A.    We don't decide.

16      Q.    Okay.  So in 2000- -- now I'm going to go to --

17 I think it was Exhibit 3, which is a 2023 background

18 check.

19            Do you have that in front of you?

20      A.    (No response.)

21      Q.    And I'm going to show it to you if you want to

22 look at your screen, if that's easier.

23            So Exhibit No. 3 --

24      A.    Yes.

25      Q.    -- has the full background check for Cynthia
```

94

1    Louis?

2        A.    Yes.

3        Q.    Which has credit cards, credit lines, evictions

4    and everything.

5              Why is it that Rob Lesperance -- in this case

6    Rob Lesperance only has the background check for the

7    criminal history?

8        A.    Because no Social Security was provided.

9        Q.    So the 9999 means there was no Social Security

10   provided?

11       A.    Yes.

12       Q.    I'm going to show you Exhibit 1.

13             Do you know who Monica Rivera is?

14       A.    No.

15       Q.    Have you ever seen Monica Rivera?

16       A.    I don't recall.

17       Q.    This lease is between Cynthia Louis in 2023 at

18   400 Sunny Isles, LLC.

19             Can you tell the jury what this 2023 at 400

20   Sunny Isles, LLC, represents?

21       A.    That is the name of the company that owns unit

22   2004.

23       Q.    Is that the same company that's owned by Marco

24   Chique?

25       A.    I believe so, yes.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1       Q.    I'm going to show you Exhibit No. 2, which is,
2  again, the approval in 2023.

3             Did you witness any of these or is your
4  signature on any of these?

5       A.    No.

6       Q.    So do you know who approved this lease?

7       A.    The approval name is there, Sadegh Nadimi.

8       Q.    Do you know who that is?

9       A.    Yes.

10      Q.    Who is that?

11      A.    A board member.

12      Q.    I'm going to focus on the 2023 lease.

13      A.    Okay.

14      Q.    You're not able to tell the jury who brought
15  this ID to the office, correct, or how the office has the
16  ID in their records?

17      A.    Repeat again.

18      Q.    The 2023 lease, the lease that happened in
19  April of 2023, Unit 2004 --

20      A.    Okay.

21      Q.    -- right?

22            You're not able to tell this jury who brought
23  in this ID and how it ended up in your office, correct?

24      A.    No.  It was just --

25      Q.    You have no personal knowledge as to who gave

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

```
 1    this --
 2              THE COURT:  Don't interrupt him.  He was still
 3    talking.
 4              MS. BOZANIC:  I'm sorry?
 5              THE COURT:  Do not interrupt him.  He was still
 6    taking.
 7              MS. BOZANIC:  Yes, your Honor.
 8    BY MS. BOZANIC:
 9        Q.    I'm sorry.  Go ahead.
10        A.    This was dropped off with the application.
11        Q.    You have no personal knowledge and you cannot
12    tell the jury who dropped this off, correct?
13        A.    The applicant.
14        Q.    I'm sorry?
15        A.    The applicant would be the one dropping it off.
16        Q.    Are you presuming this or did you actually see
17    him with your own eyes?
18        A.    The applicant is the one that drop it off.
19        Q.    Okay.  You just testified earlier that you
20    didn't see who dropped this off and that it was e-mailed
21    somehow, correct?
22        A.    I am saying the applicant is the one that would
23    be dropping it off.
24        Q.    I'm not asking you what always happens, sir.
25              I'm asking you:  Did you see Al Davis drop this
```

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    off on April 13, 2023?  Did you see him with your own

2    eyes?

3         A.   I see -- this is confusing right now.

4              You're telling me a different name, so which

5    name are you talking about?

6         Q.   Okay.  So did you see anybody drop off this ID

7    on April 13, 2023?

8         A.   This ID was mailed from Outlook.

9         Q.   Okay.  So do you know -- was it mailed to your

10   Outlook?

11        A.   Not my Outlook.

12        Q.   Because it was mailed to the Outlook, you

13   cannot tell the jury who mailed it, who dropped it off or

14   who provided it, correct?

15        A.   That's correct, yes.

16             MS. BOZANIC:  All right.  Just a moment, your

17   Honor.

18             No further questions.  Thank you.

19             THE COURT:  Redirect.

20             If you don't have any more exhibits, use the

21   lectern.

22             MR. BAILYN:  Thank you, your Honor.

23                      REDIRECT EXAMINATION

24   BY MR. BAILYN:

25        Q.   Mr. Jean-Pierre, before April 2023 when this

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    background check was run, did you see the person that the

2    defense refers to as Alfred Davis in 400 Sunny Isles?

3        A.    Who are we talking about?

4        Q.    Let me rephrase it.

5              Before the background check was run in April of

6    2023, did you see the person that you refer to as Rod

7    Lesperance in 400 Sunny Isles?

8        A.    Yes.

9        Q.    How often did you see him?

10       A.    Probably once or twice.  It depends -- I was

11   always in the office.  I was not at the front desk, so I

12   only saw him once or twice.

13       Q.    You're not the only employee at 400 Sunny

14   Isles; is that right?

15       A.    There are multiple employees.

16       Q.    All right.  What did you start as before

17   becoming an assistant property manager?

18              MS. BOZANIC:  Objection; beyond the scope.

19              THE COURT:  I don't believe it is at this point

20   yet.

21   BY MR. BAILYN:

22       Q.    What did you start as before becoming an

23   assistant property manager?

24       A.    I was a receiving clerk in 2015, and I became

25   front desk in 2016, went back to front desk lead in 2017,

1    20- -- front desk lead 2017 to 2019, and then I became

2    the assistant property manager.

3        Q.    So what was your position in 2018 during the

4    first background check?

5        A.    I was the front desk lead.

6        Q.    Is that -- the front desk lead, the person who

7    would do the background check approval?

8        A.    Yes.

9        Q.    Now, in 2023 you were asked whether or not you

10   did the background check.

11            In 2023, were you a front desk lead?

12       A.    No.

13       Q.    What were you?

14       A.    I was the assistant property manager.

15       Q.    So whose responsibility was it to do the

16   background checks?

17       A.    The front desk lead.

18       Q.    And who was the front desk lead in 2023?

19       A.    Her name was Yadalyn Monteste.

20       Q.    Okay.  Does the front desk lead, after doing a

21   background check, keep the copies of the driver's

22   licenses in the files?

23       A.    Yes.

24       Q.    Great.  Let me just ask about the background

25   check process and typing things in.

1        How exactly do you do the background check?

2              MS. BOZANIC:  Objection; beyond the scope.

3              THE COURT:  Overruled.

4              THE WITNESS:  How do I?

5    BY MR. BAILYN:

6        Q.    Yeah.  Do you call it in?  Do you type it in?

7        A.    We type it in.

8        Q.    Type it into what?

9        A.    To computer on our software base.

10       Q.    And who do you use to conduct background checks?

11       A.    Brown's Background Checks.

12       Q.    Who decides whether somebody's approved as a

13   resident?

14       A.    The board members.

15             MR. BAILYN:  One moment, your Honor.

16   BY MR. BAILYN:

17       Q.    Let me just ask this.

18             The person you know as Rod Lesperance, where

19   did he live in 2023?

20       A.    Where?

21       Q.    Yes.

22       A.    In Unit 2004.

23             MR. BAILYN:  No further questions, your Honor.

24             THE COURT:  Thank you, sir.  You are excused.

25             (Witness excused.)

1           THE COURT:  Please call your next witness.

2           MS. SADLO:  Your Honor, the United States calls

3    Jason Brown.

4           THE COURT:  Very well.

5           Do any of you need a break?  If you do, I'll

6    have one; otherwise, we can wait until after this

7    witness.

8           There's a little bit of a ramp there.

9           Please remain standing.  When you reach the

10   chair, raise your right hand, this way.

11          MR. DOMINGUEZ:  Judge, this will be my witness,

12   so I'll be doing the objections, with the Court's

13   pleasure.

14          THE COURT:  Well, whoever makes the objection,

15   it's their witness.

16          (Witness duly sworn.)

17          THE COURT:  Please be seated.  Get as close to

18   the microphones as you can.  Speak loudly.  Tell us your

19   name and spell it.

20          THE WITNESS:  My name is Jason, J-A-S-O-N, last

21   name Brown, B-R-O-W-N.

22          THE COURT:  You may proceed, ma'am.

23          MS. SADLO:  Thank you, your Honor.

24                    JASON BROWN,

25   called as a witness herein, having been first duly sworn,

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    was examined and testified as follows:

2                          DIRECT EXAMINATION

3    BY MS. SADLO:

4        Q.    Mr. Brown, what do you do for living?

5        A.    I own a number of rental properties, and I also

6    own a background check company called Brown's Background

7    Checks.

8        Q.    How long have you been operating Brown's

9    Background Checks?

10       A.    About eight, nine years, but I used to own

11   another background check company for another eight or

12   nine years.

13       Q.    How long in total have you worked in the

14   background check industry?

15       A.    About 18 years.

16       Q.    At Brown's Background Checks, who are typically

17   your customers?

18       A.    I almost exclusively do condominiums and HOAs.

19       Q.    What categories of information -- or what

20   categories of background checks do you run for

21   condominium associations?

22       A.    The condominiums have an option of running

23   three different background checks.  One is a criminal

24   background check, which covers the whole United States,

25   and it covers misdemeanors, traffic, and felonies.  Then

1   they have the option of choosing an evictions report,

2   which is both evictions filed and evictions completed.

3   And then the third part is a credit report with a FICO

4   score.  FICO is the credit score.  There are actually

5   five different credit scoring system, and FICO is the

6   oldest and most respected credit scoring system.

7        Q.   Who decides which of those categories is used

8   for a background check?

9        A.   It's normally the board of directors which sets

10   the requirements for the association, and then the

11   management office carries it out.

12       Q.   You mentioned three different types of

13   background checks, right, criminal history, evictions,

14   and credit history?

15       A.   Correct.

16       Q.   Let's go through those one at a time, first,

17   with credit history.

18            What type of information is submitted to your

19   company when someone wants to run a credit history check?

20       A.   So, in order to run a credit report, you have

21   to have a signed consent form from an applicant.  That

22   consent form has to have on it the person's name, date of

23   birth, address, and it has to be an American address, and

24   their full Social Security number.

25       Q.   What information do you need from your customer

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    at the condominium association to run an eviction check?

2         A.    An eviction check is their name and Social

3    Security number.

4         Q.    And finally, what information do you need to

5    run a background check -- a criminal history?

6         A.    The criminal report is name and date of birth.

7         Q.    Do you also need an authorization form for a

8    criminal history check?

9         A.    You do not.

10        Q.    Let's go over the process for actually running

11   the background check.

12        A.    Okay.

13        Q.    After a customer decides they want to run a

14   background check, what's the first step they do to

15   communicate that they want a check done to you?

16        A.    Well, we do not deal with any customers

17   whatsoever.  We only deal with our -- our customer is the

18   association.  So the association's management office

19   speaks with the prospective future occupants.  So the

20   occupant could be a renter, a guest, or a new owner.

21             They would communicate with the management

22   office.  The management office would indicate what their

23   requirements are for that association.  And then they

24   would collect the information from the possible future

25   resident.  Then the office logs into our system through

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    the internet with their user name and password, chooses

2    the report they want to do, and types in the information

3    that is needed to run that report.

4        Q.   So let's take each of that piece by piece,

5    starting with the system.

6             Does each customer have an individual way to

7    log into that system?

8        A.   Each client, each association has their own

9    user name and password and their own account, yes.

10       Q.   Once they've logged in using their account, you

11   said they then select the type of background check they

12   want?

13       A.   Correct.

14       Q.   Is that the credit history, eviction, or

15   criminal history categories we were just discussing?

16       A.   Exactly.  And then the system, based on what

17   they've selected, will require the data that's required

18   for that report or those reports.

19       Q.   Let's focus on a criminal history background

20   check.

21            You mentioned before they have to give a name

22   and date of birth?

23       A.   Correct.

24       Q.   What source do you use to check that

25   individual's background?

1      A.    A long time ago, people used to have to figure

2  out where people had lived and then check the courthouses

3  in those areas.  Today, with the advent of computers, we

4  deal with one data provider in California, and that data

5  provider compiles all the information from the whole

6  United States from all the courthouses.  There's

7  somewhere over 36,000 courthouses in the United States.

8           So that data provider does the work for us.

9  And we send the request to them, they check it, and then

10  they send the report back to us.

11     Q.    Do you know how that database in California

12  communicates with all those counties across the country?

13     A.    So I'm not a programmer, but I know that each

14  courthouse, because there's 36,000 of them, uses

15  different systems.  So they are constantly working on

16  their system to communicate with those courthouses.  And

17  they have to be changing that all the time.  It would be

18  physically impossible for an individual company to do

19  that without outside help, like myself.  I could never do

20  it.

21     Q.    Once that California database communicates with

22  the counties nationwide, what type of information do they

23  receive back?

24     A.    They receive the misdemeanors, felonies, and

25  traffic violations, and then they transport them back to

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    me -- transmit them.

2         Q.    How do you know that that California database

3    has completed its search?  Do they return a report to

4    you?

5         A.    Yes.

6         Q.    What do you do when you receive that report?

7         A.    If the report has things that it has found, we

8    review the report.  One of our staff will look at it and

9    review it.  If nothing has been found and the person is

10   clean, then the report is immediately sent back to the

11   client.

12        Q.    And you mentioned that some of your clients are

13   condominium associations.

14             Has 400 Sunny Isles ever been one of your

15   clients?

16        A.    I have been doing the background checks there

17   since the building was built.

18        Q.    Do you know approximately when the building was

19   built?

20        A.    Maybe ten years ago.

21        Q.    Have you reviewed copies of the background

22   checks that your company has ran for 400 Sunny Isles?

23        A.    Yes.

24        Q.    I'm showing you what's already admitted as

25   Government Exhibit 3.  We're going to go to Page 5 of

1    Exhibit 3.

2            Are you able to see that?

3        A.   Yes.

4        Q.   What is Page 5 of Exhibit 3?

5        A.   Page 5 is a criminal-only report, and on that

6    report, the person -- no information was found that they

7    had conducted any criminal offenses.  So that's why the

8    message was at the bottom, that all the different things

9    that they checked came up clean.

10       Q.   What was the date that this background check

11   was requested?

12       A.   If you see in the top-right corner, it was

13   requested on 4/13/2023.  And it was completed on

14   4/13/2023.

15       Q.   I think you might have just said this, but to

16   be clear, what type of background check is shown on

17   Page 5 of Exhibit 3?

18       A.   This is a comprehensive criminal report.

19       Q.   What information would have needed to be

20   submitted to run this comprehensive criminal report?

21       A.   If you look at the center of the report, you

22   see the person's name.  It's actually last name, then

23   first name.  You see an address, but it was not

24   necessary, and then you see a date of birth on the right.

25   And where the Social Security number would have gone, you

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   see the Xs and the 9s.  A Social Security was not

2   provided for it, or, if it was provided to the management

3   office, the management office did not type it into the

4   system.

5       Q.   What was the name of the individual whose

6   background check was researched in Page 5 of Exhibit 3?

7       A.   This particular one, the name is in the center

8   of the page.  First name is Rob, R-O-B.  Last name, I

9   can't say it -- L-E-S-P-E-R-A-N-C-E.

10      Q.   Who would have typed that information in so

11  that it could be used on the background check?

12      A.   The employee in the management office.

13      Q.   I'm now going to show you Page 7 of Exhibit 3.

14           Do you see the name on the driver's license

15  shown on Page 7?

16      A.   Yes.

17      Q.   What is the first name on the driver's license?

18      A.   The first name is Rod, R-O-D.

19      Q.   That's one letter off from the name that was

20  ran on the background check; is that right?

21      A.   Correct.

22      Q.   Does the system you use have any sort of

23  intelligence that can check for similar names?

24      A.   It actually does.  It has an extensive amount

25  of intelligence if the names are similar.  Unfortunately,

1    that one probably would not be -- that would probably be

2    in two different categories of names.

3        Q.   Where it says "comprehensive criminal search,"

4    does that mean that this background check would have used

5    that California database and checked all those counties

6    across the country, like you just described earlier?

7        A.   A hundred percent.

8        Q.   What is the purpose of -- we just reviewed a

9    driver's license.

10            And based on your experience in condominium

11   associations and working with 400 Sunny Isles, what is

12   the purpose of a condominium association receiving a

13   driver's license before they run a background check?

14       A.   The purpose of them receiving the driver's

15   license is to ascertain that the applicant is telling the

16   truth.

17       Q.   I'm showing you what's already been admitted as

18   Government's Exhibit 6.  We're going to go to Page 4.

19            What is Page 4 of Government's 6?

20       A.   Page 4 is a credit report.

21       Q.   What is the date -- Excuse me.

22            I'm now showing you Page 5 of Government's

23   Exhibit 6.

24       A.   Okay.

25       Q.   What is this page?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1        A.    So at the very top is a Social Security number

2   trace.  A Social Security number trace tells you the

3   Social Security number that's been submitted.  It tells

4   you where it's been used, where somebody was employed,

5   and that Social Security taxes were paid through their

6   payroll.  And that's how you can figure out where people

7   have lived in the past.  The next part is the evictions

8   report, and it shows that there's no evictions.  And then

9   the bottom is the criminal report, and it shows there's

10  no criminal.

11       Q.    Would the Social trace evictions and criminal

12  report have all been a part of this same package for this

13  credit history?

14       A.    This particular building picks everything.

15  They do the full package, which is very common in south

16  Florida.

17       Q.    What is the date of the background check in

18  Government's Exhibit 6?

19       A.    10/19/2018.

20       Q.    And would this background check that you --

21  that checked the criminal history again, also have used

22  that same database in California and across the country

23  you described before?

24       A.    Yes.

25       Q.    What were the results of the criminal history

1    check in Government's Exhibit 6?

2         A.    It came back with nothing, clear.

3         Q.    In your experience, why do condominium

4    associations care about background checks?

5         A.    So it's multifaceted.  One, when you're living

6    in a high-end building and you were screened and you run

7    into somebody in the elevator and you become friends with

8    them, you have the assumption that they also were

9    screened on the same level as you and that they are not a

10   danger to you.

11        Second, after 2008, when the whole area

12   crashed, real estate-wise, we had so many people, it

13   turned out, that had falsified --

14        MR. DOMINGUEZ:  Your Honor, objection; this is

15   way off field, honestly.

16        THE COURT:  I don't understand the point

17   either.

18        What's going on here?

19        MS. SADLO:  I am just asking in his experience

20   as a person who runs background checks and worked at

21   condominium associations, what the purpose of a

22   background check is.

23        THE COURT:  What does it matter?

24        MS. SADLO:  Just for the context of the

25   information.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

113

1        THE COURT:  Move on.

2        MS. SADLO:  Yes, your Honor.

3        May I have a moment to confer?

4        THE COURT:  Pardon me?

5        MS. SADLO:  May I have a moment to confer?

6        THE COURT:  Yes.

7        MS. SADLO:  No further questions, your Honor.

8        THE COURT:  All right.  Cross?

9        MR. DOMINGUEZ:  Thank you, your Honor, may I

10   approach?

11        THE COURT:  You may.

12                  CROSS-EXAMINATION

13   BY MR. DOMINGUEZ:

14        Q.   Good afternoon, Mr. Brown.

15        A.   Hello.

16        Q.   Hello.

17        THE COURT:  If you have exhibits you can sit

18   there, but otherwise, use the lectern.

19        MR. DOMINGUEZ:  Oh, I'm sorry, yeah.

20   BY MR. DOMINGUEZ:

21        Q.   Now, most of what you testified to here is just

22   general knowledge regarding the industry; is that

23   correct?

24        A.   A hundred percent.

25        Q.   It's not that you have any personal knowledge

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    regarding this case itself?

2        A.    I do not.

3        Q.    All right.  Nor do you have any information

4    regarding who took any of the information that was

5    provided to your service, correct?

6        A.    That is correct.

7        Q.    You have basically a system that works through

8    a computer and an internet type service, correct?

9        A.    A hundred percent.

10       Q.    And the company you referred to in California,

11   what's the name of that company?

12       A.    I do not recall off the top of my head.

13       Q.    Have you ever been there?

14       A.    No.

15       Q.    Do you know where it's located physically?

16   Have you seen it?

17       A.    No.

18       Q.    You just are testifying that, generally, you

19   believe it's located in California?

20       A.    Yeah, I know the address.  If I had my invoice

21   with me, I could tell you.  I pay them a lot of money.

22       Q.    But you have never been to the place?  You

23   don't know where it is?

24       A.    No.

25       Q.    And your company is a local company, correct?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1     A.    Correct.

2     Q.    And you work for local buildings in the area,

3  correct?

4     A.    Close to 500 of them.

5     Q.    And you have this system set up that's very

6  convenient for them to plug in the information.

7           Do you do the training, by the way, for the

8  associate to put the information in?

9     A.    Yes -- oh, you mean on-site?

10    Q.    On-site, yeah.

11    A.    The system is ridiculously easy, does not

12  require much training, but I personally visit every one

13  of my clients about every two or three years.

14    Q.    But do you know at each building who is

15  inputting the information?

16    A.    Not 100 percent, no,but it's somebody in the

17  management office.

18    Q.    Right, but it could be somebody new, could be

19  brand new?

20    A.    Oh, there is a lot of turnover in a

21  condominium, yes.

22    Q.    In this particular case, you have no idea how

23  accurate the information was that was provided, correct?

24    A.    A hundred percent.  It is the responsibility of

25  the management office to ascertain the accuracy through a

1   driver's license or any other means that they can.

2       Q.    And you rely on them blindly, correct?

3       A.    Yes.

4       Q.    You don't have a choice?

5       A.    No.

6       Q.    So if somebody wants to fudge with the system,

7   it's on them, correct?

8       A.    Correct.

9       Q.    Now, if you put a name in and it's off by a

10  letter or so, as you were shown in Exhibit 3, that's

11  going to throw off the search, correct?

12      A.    It probably will.  Sometimes it will still find

13  the information on the person.

14      Q.    But if you don't have the Social and you have a

15  letter off, computers are very picky --

16      A.    Without a doubt.

17      Q.    -- it's going to spit back, okay, nothing

18  found?

19      A.    Correct.

20      Q.    Because it's a matter of precision when you're

21  putting in this type of information, correct?

22      A.    Yes.

23            THE COURT:  It might spit back that he's an ax

24  murderer?  It goes either way; couldn't it?

25            It could go either way; couldn't it?

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1          THE WITNESS:  Well, you would have had to made

2     up the name of the exact ax murderer with the date of

3     birth.

4          THE COURT:  That's what I'm saying.  You don't

5     know what it could come back as.

6          THE WITNESS:  But when it comes back, then we

7     review it.

8          THE COURT:  Okay.

9          THE WITNESS:  And then if a serious crime

10    comes back, we normally do call the building and discuss

11    it.  And sometimes, I've even called the applicant

12    directly, if it's serious.

13    BY MR. DOMINGUEZ:

14        Q.   It's more likely you're going to get a false

15    positive than a false negative?  In other words, when a

16    letter is off --

17          MS. SADLO:  Objection, your Honor; compound.

18          THE COURT:  That is all right.  Let him ask the

19    question first.

20    BY MR. DOMINGUEZ:

21        Q.   What's more likely to happen?

22        A.   Unclear.

23        Q.   No record found, correct?

24        A.   Correct, yes.

25        Q.   Now, if you got somebody that comes back ax

1    murderer, then you look into it because that obviously

2    could be a mistake?

3         A.    We stop the report, and then we call the office

4    and then -- yeah.

5         Q.    But when no record comes back no record found,

6    the inquiry ends there?

7         A.    Exactly.

8              MS. BOZANIC:  Thank you, sir.  I have no

9    further questions.

10             THE COURT:  Any redirect?

11             MS. SADLO:  One moment, your Honor, please.

12                      REDIRECT EXAMINATION

13   BY MS. SADLO:

14        Q.    Mr. Brown, we heard some questions about the

15   database in California.

16             How long have you been using the system that

17   uses the California database?

18        A.    As long as I have owned the company, eight

19   years, nine years.

20        Q.    And when you receive your invoices from that

21   California database, you said that address is listed on

22   there?

23        A.    Yes.

24             MS. SADLO:  No further questions, your Honor.

25             THE COURT:  Thank you, sir.  You are excused.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1      THE WITNESS:  Thank you.

2      (Witness excused.)

3      THE COURT:  Let's take a 10-minute break --

4  I'll tell you what, we'll break until 3:30.  Folks, go on

5  in, use the restroom if you wish, drink water, whatever

6  you want, but go fast so that we can...

7      COURT SECURITY OFFICER:  All rise.

8      (Jury exits at 3:15 p.m.)

9      THE COURT:  We'll be in recess until 3:30.

10      (Court recessed from 3:15 until 3:30 p.m.)

11      (Jury enters at 3:31 p.m.)

12      THE COURT:  Please call your next witness.

13      MR. DOMINGUEZ:  We're missing an AUSA.

14      MS. SADLO:  Yes, your Honor, our next witness

15  will be Special Agent Weisenstine, but before he takes

16  the stand, as we did with the first witness, we have a

17  few pieces of evidence that we would like to move in.

18  There was also notices of authenticity filed, and I just

19  spoke to the defense counsel and they said that they

20  don't have any objection to the authenticity of these

21  exhibits.

22      THE COURT:  Okay.

23      MS. SADLO:  And I will let them speak for

24  themselves, but my understanding is that there is only a

25  remaining objection for the two convictions that we

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    discussed before.

2              THE COURT:  All right.  And I already ruled on

3    those; didn't I?

4              MS. SADLO:  Yes.  I just wanted to be clear.

5              MR. DOMINGUEZ:  And we renew them at this time,

6    Judge.

7              THE COURT:  All right.  I renew my rulings.

8              MS. SADLO:  At this time, your Honor, the

9    United States enters into evidence Government's Exhibits 9

10   through 13, and 15.

11             THE COURT:  9 through 13 and 15 are admitted.

12             Which of them are the ones that I am admitting

13   over objection.

14             MS. SADLO:  So, Your Honor, 13 is one of the

15   ones that are being admitted over objection.

16             THE COURT:  All right, 13, over objection.

17             MS. SADLO:  And 15.

18             THE COURT:  And what else?

19             MS. SADLO:  15.

20             THE COURT:  And 15 over objection, I have

21   admitted.

22             (Government Exhibits 9 through 13 were received

23   in evidence.)

24             (Government Exhibit 15 was received in evidence.)

25             THE COURT:  All right.  Go.

121

1          MS. SADLO:  The United States calls Special

2     Agent Joe Weisenstine to the stand.

3          THE COURT:  Very well.  Please come forward,

4     sir, watch your step.  There's a little ramp there.

5          (Witness duly sworn.)

6          THE WITNESS:  I do.

7          THE COURT:  Please be seated.  Get as close to

8     the microphone as you can, tell us your name and spell

9     it.

10          THE WITNESS:  My name is Adam Joseph

11     Weisenstine.  Spelling of the last name is

12     W-E-I-S-E-N-S-T-I-N-E.

13          THE COURT:  All right.  That's fine.

14          You may proceed.

15          MS. SADLO:  Thank you, your Honor.

16               ADAM JOSEPH WEISENSTINE,

17     called as a witness herein, having been first duly sworn,

18     was examined and testified as follows:

19                    DIRECT EXAMINATION

20     BY MS. SADLO:

21     Q.    Good morning, Mr. Weisenstine.

22           What do you do for work?

23     A.    I am a special agent with the FBI.

24     Q.    How long have you been a special agent with the

25     FBI?

1      A.    Over four years.

2      Q.    What did you do before becoming a special agent

3  for the FBI?

4      A.    I was in the United States Army.

5      Q.    What are your duties and responsibilities as a

6  special agent?

7      A.    I investigate financial crimes.

8      Q.    While doing your duties and responsibilities,

9  have you ever investigated an individual named Alfred

10  Davis?

11      A.    I have.

12      Q.    During your investigation, did you ever try to

13  locate Alfred Davis?

14      A.    Yes.

15      Q.    What steps did you take to locate Alfred Davis?

16      A.    I reviewed financial records associated with

17  Alfred Davis.

18      Q.    What types of financial records did you review?

19      A.    Bank statements for a personal account.

20      Q.    Did you ever review any checks that you could

21  find in the bank statements?

22      A.    Yes.  Those are commonly returned within bank

23  records for us.

24      Q.    I am showing you what's been already admitted

25  as Government's Exhibit 8.

1          Are you able to see that?

2     A.     Yes.

3     Q.     What is Government's Exhibit 8?

4     A.     This is a check from a Navy Federal Credit

5 Union account, it's titled, Alfred L. Davis, and there's

6 a -- it's made out to Miami 2023 at 400 Sunny Isles, LLC,

7 and it has a memo line stating, 400 Sunny Isles, Unit 2004.

8     Q.     Is this where you're reading from the memo line

9 here?

10    A.     Yes.

11    Q.     Is this check one of those records that helped

12 you locate Alfred Davis?

13    A.     Yes.

14    Q.     What did you do after finding this record?

15    A.     From reviewing the record and from other

16 investigations, that's typically indicative of an

17 address.  So I started a review if there's anything

18 associated with that address, such as on Google Maps, and

19 there appeared to be a condominium association down in

20 400 Sunny Isles.

21    Q.     Once you determined that 400 Sunny Isles was a

22 condominium, what did you do next for your investigation?

23    A.     I requested a subpoena for records from the

24 United States Attorney's Office to get records associated

25 with that unit.

1      Q.    And what unit are you referring to?

2      A.    2004.

3      Q.    What records did you request in the subpoena?

4      A.    Records associated with the current occupants

5   of that unit.

6      Q.    How was that subpoena served?

7      A.    I went down with another agent and we went to

8   the 400 Sunny Isles condominium and we went in person

9   with that subpoena.

10     Q.    Who did you encounter when you went to serve

11  the subpoena at 400 Sunny Isles?

12     A.    I spoke with Jeff Jean-Pierre, who was here

13  earlier today.

14     Q.    When you served the subpoena on Jeff

15  Jean-Pierre, did he show you the records you requested?

16     A.    Yes.

17     Q.    What were the types of records that he showed

18  you?

19     A.    It was many of the records shown here today,

20  but it was records associated with the current occupants,

21  including driver's license, release forms and other

22  records.  It was a multitude.

23     Q.    I believe you mentioned driver's license.

24           Do you remember the names of the individuals

25  whose driver's licenses you were shown?

1      A.    Yes, there were two driver's licenses.  One for

2  Cynthia Louis and then the other was for a Rod

3  Lesperance.

4      Q.    I'm showing you what has been previously

5  admitted as Government's 3, Page 7.

6            Is this the driver's license that you saw when

7  you went to 400 Sunny Isles to serve the subpoena?

8      A.    Yes.

9      Q.    How did seeing this driver's license affect

10  your investigation, if at all?

11      A.    I recognized the photo as Alfred Davis, and so

12  we wanted to dig more into the validity of that driver's

13  license.

14      Q.    How did you look into the validity of that

15  driver's license?

16      A.    We have access to DMV records as law

17  enforcement, so we were able to check the list of

18  driver's license number, the one that would begin with L

19  on that page, and we can query that in the DMV records

20  system to see what that returns.

21      Q.    Did you also request additional records from

22  400 Sunny Isles?

23      A.    Yes.

24      Q.    What categories of documents did you receive

25  from 400 Sunny Isles?

1      A.    Background check information.  There was data

2  sheets where someone, the applicant or occupants would

3  fill out certain information.

4      Q.    Did you also review a lease agreement?

5      A.    Yes.

6      Q.    I'm showing you Page 2 of what has been

7  admitted as Government's Exhibit 1.

8            What is Page 2 of Government's Exhibit 1?

9      A.    This is a residential lease for apartment or

10  unit for the 400 Sunny Isles, Unit 2004.

11     Q.    So who is listed as the tenant of Unit 2004?

12     A.    Cynthia Louis.

13     Q.    Did you also review -- You said you reviewed

14  the background check information for Unit 2004 as well?

15     A.    I did.

16     Q.    I'm showing you Page 9 of Government's Exhibit

17  4.

18            What is Page 4 -- or, excuse me, what is Page 9

19  of Government's Exhibit 4?

20     A.    This is the authorization to release

21  information for Brown's Background Check.

22     Q.    Who is this background check for?

23     A.    Cynthia Louis.

24     Q.    On the next page, on Page 10 of the

25  authorization form, what does the form say is the maiden

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1    name of Cynthia Louis?

2         A.    Stuckey, E-Y at the end.

3         Q.    During your investigation, did you ever look

4    into a potential relationship between Cynthia Louis or

5    Cynthia Stuckey and the defendant, Alfred Davis?

6         A.    Yes.

7         Q.    How did you look into that relationship?

8         A.    I reviewed records associated with Alfred

9    Davis's birth certificate, or actually I reviewed his

10   birth certificate.

11        Q.    Did you receive a certified copy of that birth

12   certificate?

13        A.    I did.

14        Q.    I'm now showing you what's been admitted as

15   Government's Exhibit 12.

16             What is Government's Exhibit 12?

17        A.    This is a birth certificate for Alfred Lenoris

18   Davis.

19        Q.    Who is listed as the mother on the birth

20   certificate?

21        A.    Cynthia Denise Stuckey.

22        Q.    You already said the name of the child is

23   Alfred Lenoris Davis.

24             What is the date of birth on the birth

25   certificate?

1          A.    Date of birth is January 17, 1974.

2          Q.    Now, we just discussed the background check

3    documents that were submitted for Cynthia Louis.

4                Did you review the background check documents

5    for the other occupant of Unit 2004?

6          A.    Yes.

7          Q.    Was that Rod Lesperance?

8          A.    Yes.

9          Q.    Did you review the driver's license that was in

10   the file for 400 Sunny Isles?

11         A.    Yes.

12         Q.    Is this the same license that you saw when you

13   went to serve the subpoena for Jeff?

14         A.    Yes.

15         Q.    Mr. Jean-Pierre, excuse me.

16               You mentioned earlier that you requested

17   driving records related to the information on this

18   driver's license.

19               What information specifically did you use to

20   search for those driver's records?

21         A.    So we started off with searching the driver's

22   license number.  Touching the screen, so at the top on

23   the license, you can see where it starts with L210.  So

24   we were able to search that in our access to DMV records.

25         Q.    I know we're referring to then as driver's

1    records.

2              Are those records from the Florida Highway

3    Safety and Motor Vehicles?

4        A.   Yes.

5        Q.   Did you receive those driver records for that

6    driver's license number?

7        A.   Yes.

8        Q.   I'm showing you what's been admitted as

9    Government's Exhibit 10.  I'm going to slide up to the

10   top.

11             What is Exhibit 10?

12       A.   So these are return records from FLHSMV

13   pertaining to that specific driver's license number for

14   the Rod Lesperance driver's license that was provided to

15   400 Sunny Isles.

16       Q.   I know the circle function isn't working right

17   now, but can you please describe -- I have now zoomed in

18   on Government's Exhibit 10.

19             Can you please describe where you see the

20   driver's license number on this official record?

21       A.   On the left side, kind of a third of the way

22   down, it will say DL/ID number.

23       Q.   Is where I'm pointing my finger the place that

24   you're referring to?

25       A.   Yes.

130

1    Q.    What is the name of the individual whose

2  driver's license number that is?

3    A.    Just below that number, you can see it, it says

4  Aaron James Lukoff.

5    Q.    And what is the date of birth for Mr. Lukoff?

6    A.    Middle of the page or middle of the screen you

7  can see it.  It says date of birth, 12/4/1975.

8    Q.    I'm going to put side by side Government's

9  Exhibit 3 and Government's Exhibit 10.  It's a little

10  hard to see.

11          Are you able to see both the license and the

12  information that came back on the official record?

13    A.    Yes.

14    Q.    How does the driver's license number on the ID

15  that was used for Rod Lesperance compare to the driver's

16  license number from Mr. Lukoff, from Florida Highway

17  Safety and Motor Vehicles?

18    A.    They are the same driver's license number.

19    Q.    How does the date of birth on the license used

20  for Rod Lesperance compare to the date of birth for the

21  official record for that driver's license number from

22  Mr. Lukoff?

23    A.    They are the same date of birth.

24    Q.    When you requested official records from

25  Florida Highway Safety and Motor Vehicles for this

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

```
 1    driver's license number that's on this license, did you
 2    receive any records for Rod Lesperance?
 3        A.    No.
 4        Q.    Did you receive any records for an Alfred
 5    Davis?
 6        A.    Yes.
 7        Q.    When you search this driver's license number?
 8        A.    Oh, I'm sorry.  No, I -- that was for a
 9    separate query.  I'm sorry.
10              No, for that driver's license number I did not
11    receive any information for Alfred Davis.
12        Q.    Did you later search for the driver's license
13    number for Alfred Davis?
14        A.    Yes.
15        Q.    Are those the records that you were just
16    referring to?
17        A.    Yes.
18        Q.    It's safe to say you received those records
19    from --
20        A.    Yes.
21        Q.    -- Florida Highway and Motor Safety?
22              I'm showing you what has been admitted as
23    Government's Exhibit 9.
24              What is Government's Exhibit 9, and just so you
25    can see the sticker right there?
```

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

132

1      A.   This is records returned from FLHSMV for Alfred

2 Lenoris Davis.

3      Q.   I've now zoomed in.

4           Can you please describe where on the screen you

5 see the driver's license number for Alfred Davis?

6      A.   It's on the left side, kind of the middle of

7 the way down.

8      Q.   Is this where you're reading from, where I'm

9 pointing now?

10     A.   Yes.

11     Q.   Just like we did for the last driver's license

12 record, I'm now going to put side by side Government's

13 Exhibit 9 with Page 7 of Government's Exhibit 3.

14          On the right we have the driver's license --

15 excuse me, Exhibit 3, and on the left we have

16 Government's Exhibit 9.

17          How do the driver's license numbers for Alfred

18 Davis' driver's record compare to the license number on

19 the license that was submitted?

20     A.   They're different numbers.

21     Q.   How do the date of births on Mr. Davis's

22 official record compare to the date of birth on the

23 license that was submitted?

24     A.   They're different.

25     Q.   During your investigation, did you also review

133

1    materials that were submitted for a background check for

2    a Unit 903?

3        A.    Yes.

4        Q.    Do you remember the name of the individuals

5    whose background check you reviewed?

6        A.    Rod Lesperance.

7        Q.    Was an ID submitted for the 2018 background

8    check?

9        A.    Yes.

10       Q.    I'm showing you Page 7 of Government's Exhibit 6.

11             Is this the driver's license number you

12   received from 400 Sunny Isles?

13       A.    Yes.

14       Q.    I'm going to put side by side with Government's

15   Exhibit 6, the driver's -- Government's Exhibit 10.

16             Are you able to see both sets of information?

17       A.    Yes.

18       Q.    And, for the record, Government's Exhibit 10 is

19   on the left and Government's Exhibit 6 is on the right.

20             How does the driver's license number for

21   Mr. Lukoff in Exhibit 10 compare to the driver's license

22   number in the license that was submitted in 2018?

23       A.    They match.

24       Q.    How does the date of birth of Mr. Lukoff in the

25   official record compare to the date of birth on the

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1   license submitted in 2018?

2       A.    They match.

3       Q.    You mentioned previously that when you went to

4   serve the subpoena at 400 Sunny Isles and Jeff showed you

5   the photos -- and we showed you that driver's license for

6   Rod Lesperance -- that you recognized that photo.

7             Was that your testimony?

8       A.    Yes.

9       Q.    How did you recognize the photo?

10      A.    I have been investigating Alfred --

11            MR. DOMINGUEZ:  Objection, your Honor.  This is

12  the third time we've objected to this.

13            THE COURT:  I will permit him to say he was

14  investigating him.  I don't want him to say what for, but

15  investigating, I don't think that's prejudicial in any

16  particular way.

17            Go ahead.  You were investigating --

18            MS. SADLO:  I can ask a more narrow question,

19  your Honor, as well, to abide by that.

20  BY MS. SADLO:

21      Q.    As part of your duties as a special agent, you

22  mentioned prior that you had been investigating someone

23  named Alfred Davis; is that right?

24      A.    Correct.

25      Q.    During that investigation, did you ever see the

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

 1 │ individual Alfred Davis?

 2 │      A.    Yes.

 3 │      Q.    Had you seen Alfred Davis before you served the

 4 │ subpoena at 400 Sunny Isles?

 5 │      A.    Not in person, no.

 6 │      Q.    Have you seen a photo of Alfred Davis before

 7 │ you went to 400 Sunny Isles?

 8 │      A.    Yes.

 9 │      Q.    What was your basis for recognizing the photo

10 │ on the ID for Rod Lesperance?

11 │      A.    I noticed the eyes.

12 │      Q.    Now, you said you hadn't met Alfred Davis in

13 │ person before you saw that ID?

14 │      A.    Correct.

15 │      Q.    Did you later see Alfred Davis in person?

16 │      A.    Yes.

17 │      Q.    Could you please describe the -- what the

18 │ facial features of the Alfred Davis that you saw before

19 │ here today?

20 │      A.    Yes.  I was in an elevator with Mr. Davis and

21 │ another individual.  Mr. Davis had a beard and much

22 │ shorter hair than he has today, but we were relatively

23 │ close in an elevator together.

24 │      Q.    We have talked a lot about background checks

25 │ today.

1       Does the FBI also have the ability to run

2   background checks?

3       A.   Yes.

4       Q.   Did you run a background check in this case on

5   Mr. Davis?

6       A.   Yes.

7       Q.   What were the results of your background check

8   that you ran on Alfred Davis?

9       A.   The results returned that there was a state

10  felony conviction as well as a federal felony conviction.

11      Q.   How do you know that there was a state felony

12  conviction?

13      A.   We obtained certified records from the Broward

14  County courthouse.

15      Q.   I'm now showing you what has been marked as

16  Government's Exhibit 15.

17           MR. DOMINGUEZ:  We renew our objections to

18  these exhibits, your Honor.

19           THE COURT:  I renew my ruling.  Permitted,

20  again, not for the purpose if he did it once, he could do

21  it again or anything like that.  It's for other purposes.

22           You may proceed.

23           MS. SADLO:  Yes, your Honor.

24  BY MS. SADLO:

25      Q.   And just so we can all see, it's Government's

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

137

```
 1    Exhibit -- the tag on the bottom, what is Government's
 2    Exhibit 15?
 3        A.    This is a certified judgment from the Broward
 4    County courthouse regarding defendant, Alfred Davis, and
 5    conviction for a felony crime.
 6        Q.    How do you know that it was for a felony crime?
 7        A.    If you look in the bottom right of the screen,
 8    there is a felony stamp on there.
 9        Q.    Are you referring to this stamp here
10    (indicating)?
11        A.    Yes.
12        Q.    So Government's Exhibit 15 is how you learned
13    of the state court felony conviction.
14              You mentioned a federal court conviction.
15              How --
16        A.    Yes.
17        Q.    -- did you learn that he had a federal felony
18    conviction?
19        A.    We obtained certified records associated with
20    that federal felony conviction.
21        Q.    I'm showing you now what has been admitted as
22    Government's Exhibit 13.
23              MR. DOMINGUEZ:  Same objection, Judge, for the
24    record.
25              THE COURT:  Same ruling.
```

| | |
|---|---|
| 1 | BY MS. SADLO: |
| 2 | Q.   What is Government's Exhibit 13? |
| 3 | A.   It's a United States District Court for the |
| 4 | Southern District of Florida.  It's the judgment -- or |
| 5 | imposition of sentence for a felony conviction associated |
| 6 | with bank fraud and conspiracy to commit bank fraud. |
| 7 | MS. SADLO:  Your Honor, if I can have one |
| 8 | moment. |
| 9 | No further questions, your Honor. |
| 10 | THE COURT:  Cross? |
| 11 | MR. DOMINGUEZ:  If I may approach, your Honor? |
| 12 | THE COURT:  You may. |
| 13 | MR. DOMINGUEZ:  Your Honor, I'm going to need a |
| 14 | brief break.  I was just handed the Jencks -- |
| 15 | Is that correct? |
| 16 | MR. BAILYN:  Yeah, that's correct. |
| 17 | MR. DOMINGUEZ:  -- (Continuing) literally right |
| 18 | now. |
| 19 | THE COURT:  All right.  How long do you want? |
| 20 | MR. DOMINGUEZ:  Just three minutes, if I may. |
| 21 | THE COURT:  Go ahead.  Sit down and start |
| 22 | reading. |
| 23 | MR. DOMINGUEZ:  Thank you, Judge. |
| 24 | (Brief pause in proceedings.) |
| 25 | MR. DOMINGUEZ:  I'm ready to proceed, your |

1  Honor.

2          THE COURT:  All right.

3                    CROSS-EXAMINATION

4  BY MR. DOMINGUEZ:

5      Q.   Good afternoon, Agent.

6      A.   Good afternoon.

7      Q.   Question:  Do you know who submitted the

8  driver's license for Rod Lesperance?

9      A.   No.

10     Q.   You have no personal knowledge of that,

11 correct?

12     A.   No.

13     Q.   And the check that -- which you talked about,

14 which is part of Government's Exhibit 4, $13,000, which

15 was used to pay rent, that would be paid to the -- for

16 the lease on his mother's property, where she was living?

17     A.   First, I don't know for sure if it was for rent

18 or deposit, I do want to state that.  I just know it

19 appeared to be associated with the apartment.

20          And, I'm sorry, what was the other question?

21     Q.   No, that that was for the mom, or for the

22 property affiliated with the mom's lease.

23     A.   I understood that check to be associated with

24 Unit 2004.

25     Q.   Which the lease came back to the mother?

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1      A.    Yes, yes.

2            MR. DOMINGUEZ:  Thank you.  I have no further

3      questions.

4            THE COURT:  Redirect, you're pretty darn

5      limited.

6            MS. SADLO:  No, your Honor.

7            THE COURT:  No redirect.  All right.  You're

8      excused, sir.

9            (Witness excused.)

10           THE COURT:  Call your next witness.

11           MS. SADLO:  Your Honor, the United States rests.

12           THE COURT:  Ladies and Gentlemen, the United

13     States having rested, we have a couple minutes we have to

14     talk about some legal matters.  If you go back into the

15     jury room, we'll call you out shortly.

16           COURT SECURITY OFFICER:  All rise for the jury.

17           (Jury exits at 3:56 p.m.)

18           THE COURT:  All right.  Defense, are you ready

19     to proceed?

20           MS. BOZANIC:  Yes, your Honor.  Judge, let me

21     just get my case law, I'm sorry, just give me a second,

22     please.

23           Judge, at this time we will move for a Rule 29,

24     Motion for Judgment of Acquittal.  The evidence presented

25     by the Government isn't sufficient to sustain a

1    conviction.

2         The defendant was charged in the indictment

3    with the unauthorized access device fraud with three

4    elements.  The first element they must prove that

5    defendant knowingly and with intent to defraud used a

6    counterfeit access device, and that that access device or

7    the conduct affected interstate and foreign commerce, so

8    I just, I guess, said all the three elements.

9         One of the elements, which is with intent to

10   defraud, requires that a property or money is taken from

11   somebody, and there is case law on this, *U.S. versus*

12   *Saini*, it's a 9th Circuit appellate case from 2022.  The

13   citation is 23 Federal 4th 1155.  It's 9th Circuit 2022.

14   In that case, the 9th Circuit held that an intent to

15   deceive -- an intent to defraud is an intent to deceive

16   and cheat.  An intent to deprive the victim of money or

17   property by deception.

18        They also discuss in their case -- when the

19   Government argued this, they basically said that this

20   goes together with the decision in the 11th Circuit

21   Court, and they talk about *U.S. versus Klopf*.  That's

22   K-L-O-P-F.  That's 423 Federal 3d 1228.  This is an 11th

23   Circuit 2005 case that also holds for the same -- it

24   basically says that it aligns with the ruling, and it

25   requires an intent to deceive for purpose of causing

1   another to suffer financial loss or obtaining something

2   of value, and it quotes *U.S. versus Peden*, P-E-D-E-N,

3   556 Federal 2d 278.  That is a 5th Circuit 1977.

4           In this case, your Honor, you heard testimony

5   that there was a fraudulent ID or an ID with the name of

6   Rob Lesperance.  No one could testify, first of all, who

7   submitted -- and I'm talking specifically about the 2023,

8   the crime charged in the indictment.  No one was able to

9   testify who provided this ID.  The manager testified that

10  it happened to be in the file.

11          As far as the intent to defraud element, you

12  didn't hear from anybody being defrauded.  There is no

13  money -- there's no money that was defrauded from

14  anybody, no property.  The owner -- Marco Chique is the

15  owner of this property, of the Unit 2004.  There is no

16  allegation that he was not paid rent.  There was no

17  testimony from him that he was out for any money.  And in

18  fact, the Government is arguing that the property

19  management company is the victim.  They cannot be the

20  victim, your Honor, because they don't own this apartment

21  and they were not defrauded because my client didn't have

22  the intent to defraud because he didn't take anybody's

23  property or money.  This should have been a state charge,

24  it is a possession or a use of a fraudulent ID, but for

25  the federal charges, this charge requires that there is

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

**1**    intent to defraud, and there was no intent to defraud in

**2**    this case.  The Government has failed to show that.

**3**           Furthermore, the Government has failed to have

**4**    anybody identify Mr. Davis as the person who resided

**5**    there.  The only person they had on the stand was Jeff

**6**    Jean-Pierre, who never identified Mr. Davis as Rod

**7**    Lesperance.

**8**           And as far as the third element, the interstate

**9**    commerce, there was some testimony that this submission

**10**    or this use of ID caused them to submit a credit

**11**    background check in another state.  Essentially, they

**12**    used somebody else's name.  There was a typo, there was

**13**    no Social Security used.  It has the 999 on the

**14**    application.  There is actually no application in the

**15**    2023 file, Rob Lesperance or whoever never even signed an

**16**    application intending to have a background check ran as

**17**    opposed to the other documents.

**18**           But, Judge, I think the main argument here

**19**    rests on the intent to defraud.  Based on the case law

**20**    that I cited, there are plenty of cases that stand for

**21**    the same proposition that you have to have the financial

**22**    loss or obtaining something of value, and basically all

**23**    the case law says that the intent to defraud means to

**24**    cheat or to deceit -- I'm sorry, to have the deceit and

**25**    cheat somebody out of money or property.  Mr. Davis did

144

1    not deceive or cheat anybody out of money or property.

2    The rent was paid, and that's what the evidence showed.

3             So for those reasons, we move for judgment of

4    acquittal.

5             MR. DOMINGUEZ:  And no ID.

6             MS. BOZANIC:  And the no ID.  And we renew our

7    previous objections, your Honor.

8             THE COURT:  All right.  Government?

9             MR. BAILYN:  Your Honor, I can respond to all

10   three points the defendant has made.  Given the light

11   most favorable for the Government, there is more than

12   enough for a reasonable jury to find this defendant

13   guilty.

14            First, with regard to the use of a counterfeit

15   access device, the argument that there is no evidence,

16   that this defendant provided that device, is a red

17   hearing.  What is required by the jury instructions is

18   that a person use an access device, which is defined as

19   any effort to obtain anything of value with a counterfeit

20   access device.  This defendant did obtain a thing of

21   value.

22            As we learned from Mr. Jean-Pierre, the

23   defendant gained access to an exclusive residential

24   community, access to valet, access to mail, access to a

25   place he could call his home.  That's very, very

1   valuable.

2        Second, with regard to the intent to defraud,

3   the defense continually cites, both here and in the jury

4   instructions, *United States versus Saini*, which is a 9th

5   Circuit case that is problematic for two reasons.  First,

6   the language of *Saini* directly contradicts the jury

7   instructions in the 11th Circuit, which were promulgated

8   after *Saini* was decided.  It's true, *Saini* does say that

9   there needs to be an intent to defraud and deceive.  The

10  jury instructions from the 11th Circuit, rather, say that

11  an intent to defraud means to act with intent to deceive

12  or cheat, and then, usually for personal financial gain,

13  but not always for personal financial gain.

14        Whatever cases the defendant is citing by that

15  hole that there must be some sort of personal financial

16  gain are contradicted not only by the jury instructions,

17  but also by the 11th Circuit explicitly.

18        I can provide the case to your Honor, we have

19  it printed out, but recently in *United States versus*

20  *Ippolito*, 701 Federal Appendix 805 and 807, the 11th

21  Circuit specifically ruled:  We have not held that the

22  intent to defraud can be shown only if the defendant has

23  both the intent to deceive and the purpose of causing

24  financial loss or receiving financial gain.

25        In fact, the 11th circuit hasn't addressed this

1    issue of the intent to defraud that the defense is

2    putting forth here.

3            And in *United States versus Waters*, which I can

4    also provide the Court, 937 F. 3d 1344, the defense asks

5    for a jury instruction similar to the one that defense is

6    arguing for here, this concept of deceit or deceive or

7    whatever it is.  The 11th Circuit said that giving such a

8    jury instruction would have been an error.  The

9    requirement that a defendant have the intent to -- or

10   whatever the defense wants to define it to be, but

11   without ever defining what that harm meant.

12           In this case, there was an intent to defraud,

13   to deceive, to defraud, to provide a false identity to

14   gain access to something that the defendant was not

15   entitled to.  That's the definition of defraud.  The

16   defendant gained access to a place that he was not

17   entitled to be in.  That's access device fraud.

18           As to the third element, interstate commerce,

19   we had ample testimony from Mr. Jason Brown with regard

20   to where the information in these background checks comes

21   from.  Clearly, he's running a national background check.

22   He's not doing it just in the State of Florida.  He has

23   databases, as he explained, as far away as California.

24   That is the effect of interstate commerce.  There is no

25   need in this case for us to be able to show the specific

1    intent that the defendant knew interstate commerce was

2    affected, only that interstate commerce was affected and

3    it was affected in this case.

4          The Government has provided sufficient evidence

5    for this jury, or any reasonable jury, to find this

6    defendant guilty beyond a reasonable doubt.

7          THE COURT:  Did you ever have to consider the

8    possibility of having somebody point at him and say:

9    That's the guy that did it?

10          MR. BAILYN:  Your Honor, we don't have the

11    person who is there when the defendant emailed this

12    driver's license, because this was emailed.

13          THE COURT:  Is that a fatal flaw?

14          MR. BAILYN:  No.  There's more than enough

15    circumstantial evidence that it was this defendant who is

16    the one that used that driver's license.  First, not only

17    does the driver's license show the defendant, not only

18    does the driver's license from before show the defendant,

19    but the lease that we're dealing with here, the one that

20    he was added as an occupant to, is his mother.

21          There is more than enough circumstantial

22    evidence for it to be this defendant and no one else who

23    would use a counterfeit driver's license --

24          THE COURT:  How do we know it's his mother?

25          MR. BAILYN:  We introduced the certified birth

1    certificate that shows Cynthia Stuckey --

2          THE COURT:  Okay.  I remember that now.

3          MR. BAILYN:  -- is the defendant's mother.

4          There would be no one else in the entire world,

5    your Honor, that would be identically imaged as the

6    defendant, and also have the same mother.

7          THE COURT:  I'll reserve ruling on this motion.

8          MR. DOMINGUEZ:  His mother could have submitted

9    the ID.

10          THE COURT:  It could have been --

11          MR. BAILYN:  Again, the question is not

12    whether who someone submitted it --

13          THE COURT:  It could have been Jack Spratt.

14          MR. BAILYN:  -- but that someone used it.  This

15    was the defendant who used it for his benefit.

16          THE COURT:  I've reserved ruling.

17          What are we getting from the defense?

18          MS. BOZANIC:  Judge, can we have a few minutes

19    just to discuss with our client whether he wants to put

20    on a defense.

21          THE COURT:  Okay.  Take a couple minutes.

22          (Court recessed from 4:08 p.m. to 4:14 p.m.)

23          THE COURT:  All right.  What's happening?

24          MS. BOZANIC:  Just a moment.

25          Judge, we'll go ahead and rest when the jury

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

| | |
|---|---|
| 1 | comes in. |
| 2 | THE COURT:  No testimony from the defendant? |
| 3 | MS. BOZANIC:  No testimony from the defendant. |
| 4 | THE COURT:  All right.  Mr. Davis, you have |
| 5 | spoken to your attorneys.  I know you were outside for a |
| 6 | few minutes. |
| 7 | Have you had time to speak to your attorneys |
| 8 | about whether or not you want to testify in your own |
| 9 | defense? |
| 10 | THE DEFENDANT:  Can I have a few more |
| 11 | seconds -- a few more minutes, Judge? |
| 12 | THE COURT:  Well, we got to get moving one way |
| 13 | or the other.  I don't really care what you do, but you |
| 14 | got to be prepared and ready to go.  And we've waited |
| 15 | about 12, 13 minutes, I think. |
| 16 | If you want a couple more minutes, I'll give |
| 17 | you a couple more minutes there at the table, but that's |
| 18 | about it. |
| 19 | (Pause in the proceedings.) |
| 20 | MR. DOMINGUEZ:  We'll proceed, Judge. |
| 21 | THE COURT:  You're sticking with your decision? |
| 22 | MR. DOMINGUEZ:  Yes. |
| 23 | THE COURT:  All right.  Mr. Davis, you |
| 24 | understand that you have the right to testify and that |
| 25 | you may voluntarily elect to testify in your own defense? |

1          THE WITNESS:  Yes.

2          THE COURT:  You understand that you, and only

3    you, have a choice whether or not to testify, and only

4    you can make that decision, not your attorney or anyone

5    else?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Has anyone attempted in any way to

8    force you not to testify?

9          THE DEFENDANT:  No.

10          THE COURT:  Have you personally made the

11   decision not to testify?

12          THE DEFENDANT:  Yes.

13          THE COURT:  All right.  Then here's what we're

14   going to do.  We'll recess for the day because I don't

15   think we can do final arguments and send the jury out.  I

16   don't propose to pay the CSOs overtime to be here.  As

17   much as they want to take the overtime, I don't think

18   it's fair to them, because I don't think they have money

19   for it.

20          We'll recess until tomorrow morning.  I'll

21   bring the jury in, and I'll send them home for the night.

22   And we'll meet again tomorrow morning at 10:30.

23          I have physical therapy at 9:00.  It goes from

24   9:00 to 10:00, and then I'll be in right after and as

25   soon as I can get dressed;.

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1          Let's bring the jury in and we will talk to

2    them and tell them what we are doing.

3          Then we will proceed with final arguments and

4    go from there.

5          (Jury enters at 4:21 p.m.)

6          THE COURT:  Please be seated.  Make sure

7    everybody is here.  Anybody that is not here, speak up.

8          Ladies and gentlemen, we're going to break for

9    the day at this time, and we're going to come back

10   tomorrow morning at 10:30.  I have therapy in the morning

11   at 9:00, and I should be through by 10:00 or 10:15, and

12   I'll get here as soon as I can.  I will put my long pants

13   on because it wouldn't be fair to the other gentlemen for

14   you ladies to see my legs.  It would be extraordinary,

15   and you would be embarrassed.  So I don't want to do

16   that.

17         So I'll wait until about 10:30, and we'll start

18   again then.

19         All right.  Let me just get it done.

20         Defense, what is your position at this time?

21         MS. BOZANIC:  At this time, defense rests.

22         THE COURT:  All right.  The Government having

23   rested and the defense having rested, it's ready for the

24   case to go to you.

25         Now, don't start thinking about the case

1    tonight.  Don't start making your mind up.  Wait until

2    you have the opportunity to have the benefit of the

3    closing arguments.

4           How long are you going to want for closing

5    arguments?

6           MS. SADLO:  Your Honor, 15 minutes should be

7    sufficient for the first close; 30 minutes in total, I

8    would say, for first close and rebuttal.

9           THE COURT:  So you want 30 minutes.

10          MS. SADLO:  Yes, your Honor.

11          THE COURT:  You'll take 30 minutes, too.

12          MS. BOZANIC:  Judge, 30 should be fine.

13          THE COURT:  So each side will take 30 minutes,

14   so that will let us have this before lunch.  You guys

15   might even get a free lunch out of this.  And then I'll

16   instruct you, and then we'll go from that point forward,

17   and it will be up to you.  It doesn't mean the case four

18   hours so you need to take four hours.  No.  You can do it

19   four minutes or you can do it in four days.  It's your

20   call, not mine.  So we'll go from that point.

21          But you're reminded you are not to discuss the

22   case with anyone or permit anyone to discuss it with you.

23   Until you retire to the jury room at the end of the case

24   to deliberate your verdict, you're simply not to talk

25   about the case.

1          Also, remember you're not to read or listen to

2    anything touching on this case in any way.  If anyone

3    should try to talk to you about the case, bring it to my

4    attention promptly.

5          Keep in mind you must not do any research or

6    make any investigation about the case on your own.  The

7    only evidence in this case is the testimony of the

8    witnesses that you hear in court and the evidence that is

9    introduced during the official proceedings.

10          Also, remember you must not have any contact

11   with the attorneys, parties, or witnesses in the case.

12   If you should see them, keep in mind they're not being

13   rude to you.  They are required to avoid any contact with

14   you.  They're not permitted to talk to you, just as

15   you're not permitted to talk to them.

16          Finally, remember you must not form any opinion

17   about this case until all the evidence is in and all of

18   the arguments have been made, and you have received your

19   instructions on what the law is.

20          Keep an open mind until you start your

21   deliberations at the end of the case, which will be

22   tomorrow, just before or just after lunch.  So I'll ask

23   you to please leave the floor quickly because I'm going

24   to ask the people that are here to wait in the courtroom

25   until you have had an opportunity to leave, and leave the

154

1   building.

2          All right.  So come back tomorrow morning,

3   10:30, and come on and sit in the jury room as quickly as

4   you can get there.

5          You're excused.

6          (Jury exits at 4:24 p.m.)

7          THE COURT:  You all can be seated.  I would ask

8   that everybody remain in the courtroom for a few minutes

9   to let the jury clear the floor.

10         We'll go through the instructions at this point

11  so we can get an idea so you can prepare for your final

12  arguments knowing what instructions I propose to give.

13         MS. BOZANIC:  Judge, I just wanted to renew our

14  previous judgment of acquittal argument.  It's the same

15  argument that I made, and we renew our previous

16  objections and motions.

17         THE COURT:  All right.  And I will renew my

18  rulings, one of which is that I'm deferring.

19         MS. BOZANIC:  Thank you, Judge.

20         THE COURT:  All right.  Proposed Instruction

21  No. 1 is the pattern 11th jury instruction agreed to by

22  the parties, the introduction.

23         First instruction is proposed jury instruction

24  No. 1, B1, introduction, pattern 11th Circuit instruction

25  with no changes.

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

1          Page 2 is Proposed Instruction No. 2, the duty

2     to follow instructions and the presumption of innocence,

3     pattern 11th Circuit instruction agreed to by the

4     parties.

5          Third is proposed B2.2, the duty to follow

6     instructions and the presumption of innocence when a

7     defendant does not testify.  This is the instruction that

8     will be given since he has not testified.  I think

9     between the two, we'll give the second, of course,

10    because he did not testify.  I think it's basically --

11    no, I think both will be given.  Let me see.  I am not

12    sure.  I don't think I need to give that.  I don't see

13    any harm in giving both of those.

14         Does anybody object to my giving the one

15    Proposed Instruction No. 1, B1 and No. 2, B2.1 -- I'm

16    sorry.

17         I'm talking about B2.1 and B2.2.  Of those two,

18    B2.2 is the one that I will give because the defendant

19    has not testified.  So B2.1 will not be given.  I'll X

20    that out and remove it from there.

21         Proposed Instruction No. 4 is B3, definition of

22    reasonable doubt, the pattern 11th Circuit instruction

23    agreed to by the parties.

24         Proposed Instruction No. 5, consideration of

25    direct and circumstantial evidence, argument of counsel,

156

1  comments by the Court, 11th Circuit instruction agreed to

2  by the parties.

3       Proposed Instruction No. 6 is B5, credibility

4  of witnesses, pattern 11th Circuit instruction, agreed to

5  by the parties will be given.

6       Proposed Instruction No. 7, B7, there was no

7  expert witness.  I will not give this.

8       Any objection?

9       MS. BOZANIC:  No, your Honor.

10      THE COURT:  Proposed Instruction No. 8, I don't

11 think there is any inconsistent statements brought out in

12 this matter, is there anything you need for this

13 instruction?

14      MR. DOMINGUEZ:  No.

15      THE COURT:  I will not give this.

16      Proposed Instruction No. 9 is B8, and the

17 introduction.  As you can see in the notes -- those notes

18 will be removed.  The only thing that will be given to

19 the jury will be the regular print, not the bold print.

20 Agreed to by the parties, except the defendant proposed

21 quote:  And said conduct affected interstate and foreign

22 commerce.  But this is consistent with the pattern 11th

23 Circuit jury instruction.  This is the instruction that I

24 will give.

25      Proposed Instruction No. 10, B10.1, punishment,

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

157

1    single defendant and single count, and that would be the

2    instruction that is given.

3            Proposed Instruction No. 11, on or about,

4    pattern 11th Circuit instruction, that's the one that

5    will be given.

6            Proposed Instruction No. 12 is B11, the duty to

7    deliberate.  It is the pattern instruction agreed to by

8    the parties.

9            Proposed Instruction No. 13 is B12, verdict,

10   and I will give this but probably not exactly where I

11   have given it.  I'm not sure exactly where I'll give

12   that, but I think it will be the last thing I give before

13   they walk off.  It doesn't make any sense for it to be

14   any earlier than that.

15           Proposed Instruction No. 14, I don't think

16   that's really -- there's been no identification in this

17   case.  The identification is based on pictures, not on

18   somebody pointing and saying, That's the guy that did it.

19           Is there a need for this instruction?

20           MR. BAILYN:  No.  This is not an in-person

21   identification.  It's a circumstantial identification

22   case.

23           MR. DOMINGUEZ:  Well, you do need the part that

24   it's the Government's burden beyond a reasonable doubt

25   that the defendant was the person who committed the

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1    crime.  We do have to have that.

2              THE COURT:  Yeah, I don't see any problem with

3    that.

4              MR. DOMINGUEZ:  And then it has at the end:

5    After examining all the evidence, if you have a

6    reasonable doubt that the defendant was --

7              THE COURT:  Yeah, I will give the first and

8    last paragraph.  I think that they are appropriate.

9              Any objection?

10             MR. BAILYN:  That's fine, your Honor.

11             THE COURT:  All right.

12             Proposed Instruction No. 15 is S4.1, similar

13   acts evidence.  And this is the one that is explaining,

14   and I think that it is a pattern 11th Circuit

15   instruction, and it's appropriate that it be given as

16   modified.  I will conform with the pattern 11th Circuit

17   instruction, so I changed it slightly.

18             The next one is note-taking is denied, as this

19   Court does not permit note-taking.  It might be if it was

20   a complicated accounting case, but this case does not

21   require any notes, so I will not give that.

22             Proposed Instruction No. 17, similar acts

23   evidence, the Government's proposed instruction as

24   modified by this Court to conform with the pattern 11th

25   Circuit instruction.

1          Proposed Instruction 18, it is the pattern jury

2   instruction as modified by this Court to conform.  In

3   other words, it was the instruction that was given as

4   modified by me to conform to the 11th Circuit pattern

5   jury instruction.  I don't remember exactly what the

6   change was, but...

7          MR. DOMINGUEZ:  May we have a moment, Judge,

8   please?

9          THE COURT:  Okay.

10          MS. BOZANIC:  You basically removed the --

11          MR. DOMINGUEZ:  So you basically removed the

12   request by both parties, I think.  You just left it

13   pattern.

14          THE COURT:  Yeah.

15          MR. DOMINGUEZ:  That's fine with me.

16          THE COURT:  What was it you guys wanted added?

17          MR. BAILYN:  The Government wished to add the

18   11th Circuit -- a quotation from the 11th Circuit case,

19   from multiple 11th Circuit cases, that the intent to

20   defraud is defined as the intent to obtain something to

21   which is the defendant is not entitled.

22          THE COURT:  You can argue that to them.

23          MR. BAILYN:  Thank you, your Honor.

24          THE COURT:  I don't think there is any

25   objection to your arguing that to them.  If there is, it

STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT

| | |
|---|---|
| 1 | would be overruled because I think that that is case law. |
| 2 | MR. BAILYN:  Thank you, your Honor. |
| 3 | THE COURT:  I'll clean this up because it does |
| 4 | have too many parentheses and stuff in there, and we can |
| 5 | talk about it before we actually give it.  Again, we'll |
| 6 | talk about it first.  So you guys, you think about it, |
| 7 | and if you think I'm going to step on my tie, let me |
| 8 | know. |
| 9 | MR. DOMINGUEZ:  We will, Judge. |
| 10 | THE COURT:  Especially that last paragraph has |
| 11 | a lot of different paragraphs. |
| 12 | MR. BAILYN:  It allows for interstate and |
| 13 | foreign commerce, I think foreign commerce -- |
| 14 | THE COURT:  I'm deleting the foreign commerce |
| 15 | part. |
| 16 | MR. BAILYN:  Great.  Thank you, your Honor. |
| 17 | THE COURT:  So, Jessica, delete all the country |
| 18 | to state.  I mean, in the first letter -- first sentence |
| 19 | of that you can say it affected interstate or foreign |
| 20 | commerce, but the Government must prove that the natural |
| 21 | concept for the act would be to affect interstate |
| 22 | commerce.  You can just -- either one.  Just delete it in |
| 23 | the first one, too.  And you can delete the paragraph |
| 24 | immediately in front of it because foreign commerce is |
| 25 | not relevant in this case.  The previous one paragraph is |

 1   the one that counts.  Okay.

 2            MR. DOMINGUEZ:  Didn't we have already --

 3            MS. BOZANIC:  Number 19?

 4            MR. DOMINGUEZ:  -- a 404(b) one?  We filed like

 5   three of them.

 6            THE COURT:  That's No. 19.  No, I don't think

 7   it's the same, but...

 8            MS. BOZANIC:  I'm looking at 17 and 19, Judge,

 9   just to compare.

10            THE COURT:  I would think you'd want it said

11   twice, but I don't care.

12            MR. DOMINGUEZ:  No, it is different.  I was

13   making sure it wasn't --

14            THE COURT:  Yeah, it's a little bit different.

15            MR. DOMINGUEZ:  Yeah.

16            THE COURT:  So moving on to 20, similar acts

17   evidence.  It is a pattern 11th Circuit jury instruction.

18   And then, after this one is when I would give the verdict

19   form.

20            I will give actually the duty to deliberate and

21   the verdict form at the end of -- right after the one we

22   just talked about.  So that will be the last two, will be

23   Proposed Instruction No. 12 and Proposed Instruction

24   No. -- I would assume 13, but I can't, my fingers are too

25   dry to get to it.

162

1          Yeah, proposed 12 and 13 will be the last two

2    instructions, okay?  And if you come up with something

3    brilliant that you think I should substitute for one of

4    these when you're working on this into the wee hours of

5    the morning, I'll be happy to discuss it with you.

6          MR. BAILYN:  Can I ask a quick procedural

7    question?

8          THE COURT:  Sure.

9          MR. BAILYN:  Do you instruct the jury before we

10   give the closing?

11         THE COURT:  No, after.  I have done it both

12   ways, but I've only done it before maybe three times in

13   23 years, so it's not really common.  I've done it when

14   it was a very, very complicated case and they wanted to

15   get this in their mind before that, and both sides wanted

16   it.  I didn't have any objection to doing it, but it

17   doesn't seem like a unnecessary thing to do in this case.

18         Okay.  See you guys tomorrow, 10:30.

19         (Proceedings concluded at 4:36 p.m.)

20

21

22

23

24

25

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**

1

2

## C E R T I F I C A T E

3

4          I certify that the foregoing pages represent a

5   true and correct excerpt of the above-styled proceedings

6   as reported on the date, time, and location listed.

7

8          I further certify that I am neither counsel

9   for, related to, nor employed by any of the parties to

10  the action in which this hearing was reported, and

11  further that I am not financially nor otherwise

12  interested in the outcome of the above-entitled matter.

13

14

    DATE: 6/24/24     /s/Mary Ann Casale, RDR, FPR-C, CLR, CSR-IL
15                    Official Court Reporter
                      United States District Court
16                    Southern District of Florida
                      400 North Miami Avenue
17                    Miami, Florida 33128
                      MaryAnn_Casale@flsd.uscourts.gov
18

19

20

21

22

23

24

25

**STENOGRAPHICALLY REPORTED COMPUTER-AIDED TRANSCRIPT**